[No. 81449-0. En Banc.]
Argued September 15, 2009. Decided June 17, 2010.

THE STATE OF WASHINGTON, *Petitioner*, V. NEIL GRENNING,
*Respondent.*

*Mark E. Lindquist, Prosecuting Attorney*, and *Michelle Hyer, Deputy*, for petitioner.

*Rita J. Griffith*, for respondent.

¶1 CHAMBERS, J. — Neil Grenning was charged with 72 counts of child sex crimes, and his home computer was seized. Prior to trial, Grenning moved for mirror-image copies of the hard drives from that computer. The trial court granted only limited access. His defense team could access copies of the hard drives only in the County-City Building, only on government operating systems and software, and only during limited hours. Under these limitations, Grenning was unable to obtain an expert willing to examine the hard drives. A jury ultimately convicted him of 16 counts of first degree child rape; 26 counts of sexual exploitation of a minor; 6 counts of first degree child molestation; 20 counts of possession of depictions of minors

engaged in sexually explicit conduct with sexual motivation, commonly referred to as possession of child pornography, among other crimes. He was sentenced to 117 years in prison.

¶2 The Court of Appeals largely affirmed, but it reversed Grenning's 20 counts of possession of child pornography, finding he was denied access to critical evidence to which he was entitled. We granted review and affirm.

## FACTS

¶3 Police detectives found sexually explicit pictures, including pictures of Grenning's two victims, on his home computer. Long before trial, defense counsel retained experts and made a CrR 4.7 motion to compel discovery in the form of a mirror image of the hard drives that defense experts could analyze in their lab. The Pierce County Prosecuting Attorney's Office moved for a rigorous protective order, arguing the hard drives should be viewed only by the defense team at the police station and under limited conditions. Judge Worswick, concerned that the images of the victims could be released onto the Internet, largely granted the State's motion. Among other things, the protective order directed the investigating detective to copy the hard drives onto blank hard drives provided by the defense, to "provide a CPU [central process unit], monitor, keyboard, mouse and an operating system of [the expert's] choosing" to look at the material, and forbade any copying of the information. Clerk's Papers (CP) at 598. The order further limited the defense's access to the evidence both in time and location.[1]

¶4 The original experts retained by defense counsel declined to work on the case under the conditions of the

---

[1] The trial court's order does not specify the police station. Instead, it says that the investigating officer "shall provide . . . a secured location in the County-City Building where they may forensically examine the contents of the Mirrored Drives." CP at 598. The defense was allowed to look at the material only between 8:30 a.m. and 4:30 p.m., Mondays through Fridays.

protective order and the defense had considerable difficulty finding experts who would. Seven months before trial, the defense found an attorney and computer expert, Robert Apgood, who was willing to review the computer files, but like the original experts, wanted a copy to take to his own lab. Apgood submitted a declaration explaining that he had the equipment to analyze the mirror image hard drives at his lab in Seattle and

> forensic analysis of the copies of seized media is a detailed process entailing the use of specialized hardware and forensic software designed to allow bit-by-bit search and review of the media being studied. This analysis must be performed in a manner that ensures that the media is not changed in any way during that analysis.

*Id.* at 602. He also declared that "[a] search conducted in a controlled environment, such as [the expert's] forensics lab, can be initiated and 'left to process' unattended," leaving the expert free to do other work and "not financially burden the public for his time." *Id.* at 603. Among other things, Apgood informed the court that he was concerned about the sanctity of the attorney work-product doctrine if his work were "supervised" by the State, especially given that any work he did on government computers could be reviewed by the government by analyzing the computer after he was through. *Id.* at 603-04. Based on this declaration, the defense unsuccessfully moved to modify Judge Worswick's order before Judge Hogan. Judge Hogan noted that "I think that there is a balancing act . . . in the very fundamental right for the defense to be prepared for trial" and the victims' interest in keeping the pictures off of the Internet. Verbatim Report of Proceedings (VRP) (Mar. 26, 2004) at 83-85. She was, however, somewhat willing to revisit the issue. "I want to know if [Judge Worswick's order] is unworkable. I don't think that it is." *Id.* at 85. Apgood declined to examine the hard drives at the County-City

Building and the defense, having lost two motions for access, did not make another.[2]

¶5 Three months later, Grenning went to trial without an expert witness who had examined the hard drives. Among other evidence, the jury was given 117 pictures from Grenning's computer. There was also considerable testimony and argument that the commercially produced images underlying the child pornography charges contained sexually explicit images of children, as opposed to images that had been manipulated into appearing as such or stills from a single movie.[3]

¶6 Grenning was convicted on 71 counts and sentenced to 117 years in prison. He was sentenced to one year on each of the possession of child pornography charges, to be served concurrently. While his case was on direct appeal, this court announced *State v. Boyd*, 160 Wn.2d 424, 158 P.3d 54 (2007). *Boyd* held that the defense was entitled to a mirror image copy of the defendant's computer hard drives. *Id.* at 441. The Court of Appeals affirmed all convictions except the 20 counts of possession of sexually explicit pictures of children under former RCW 9.68A.070 (2006).[4] *State v. Grenning*, 142 Wn. App. 518, 536, 174 P.3d 706 (2008). Those charges were reversed and remanded. *Id.* Grenning petitioned for review and the State cross-petitioned on the reversed charges. We denied Grenning's petition and

---

[2] The dissent is correct that nothing in our record supports the statement that the experts "refused" to examine the hard drives. Based on the facts recounted above, we may fairly infer that the defense was not able to find an expert willing to work within the limitations of the protective order. Also based on those facts, we respectfully disagree with the dissent's assertion that "the defendant made no effort to engage in the discovery process about which he now complains." Dissent at 62. The defense made valiant, though unsuccessful, efforts.

[3] For example, Detective Richard Voce was asked by the prosecutor about "some blocking at the top of the screen" and responded that "[t]his particular was done by a user[, the] reason is it's squared, completely symmetrical, goes across straight lines." VRP (June 15, 2004) at 553.

[4] "A person who knowingly possesses visual or printed matter depicting a minor engaged in sexually explicit conduct is guilty of a class B felony." Former RCW 9.68A.070.

granted the State's cross petition.[5] *State v. Grenning*, 164 Wn.2d 1026 (2008).

## ANALYSIS

### *Boyd*

 ¶7 The State argues the Court of Appeals erred and our decision in *Boyd* does not apply because of the different procedural postures of the two cases. Whether *Boyd* applies is a question of law that we review de novo. *Dreiling v. Jain*, 151 Wn.2d 900, 908, 93 P.3d 861 (2004) (citing *Rivett v. City of Tacoma*, 123 Wn.2d 573, 578, 870 P.2d 299 (1994)). In both *Boyd* and its consolidated companion case, *Giles*, the defendants were charged with child pornography offenses. *Boyd*, 160 Wn.2d at 429. Boyd's computer was seized; pictures and videotapes were seized from Giles. Both defendants, like Grenning, moved for copies of the evidence against them. *Id.* at 435-36. In *Boyd*, the motion was denied; in *Giles*, it was granted. Before trial was held in either case, this court granted interlocutory review of the discovery orders themselves. Therefore, in *Boyd*, this court was not reviewing a conviction, but rather the defendants' right to compel discovery.

¶8 First, we held that the mandatory disclosure provisions of CrR 4.7(a), rather than the discretionary provisions of CrR 4.7(e), applied. *Id.* at 432. CrR 4.7 states in relevant part:

**(a) Prosecutor's Obligations.**

(1) *Except as otherwise provided by protective orders* or as to matters not subject to disclosure, *the prosecuting attorney shall disclose* to the defendant the following material and information within the prosecuting attorney's possession or control no later than the omnibus hearing:

. . . .

---

[5] Because we denied review of Grenning's petition, several of the issues touched on in the State's answer to that petition have been rendered moot and will not be addressed.

(v) *any* books, papers, documents, *photographs, or tangible objects,* which the prosecuting attorney intends to use in the hearing or trial *or which were obtained from or belonged to the defendant.*

CrR 4.7 (emphasis added). Since CrR 4.7(a)(1)(v) applied, the State had a duty to disclose the evidence. *See Boyd*, 160 Wn.2d at 432. Next, the court rejected the State's argument that it need not provide the defense with actual copies of the material, as opposed to simply "acknowledging the existence of seized evidence." *Id.* at 433. We explained:

> The principles underlying CrR 4.7 require meaningful access to copies based on fairness and the right to adequate representation. The discovery rules "are designed to enhance the search for truth," and their application by the trial court should "insure a fair trial to all concerned, neither according to one party an unfair advantage nor placing the other at a disadvantage." Under CrR 4.7(a), the burden is on the State to establish, not merely claim or allege, the need for appropriate restrictions. The defendant does not have to establish that effective representation merits a copy of the very evidence supporting the crime charged. To adopt the State's position is to restrict the defendant's right to potentially exculpatory evidence on the State's mere allegation that the evidence involves contraband.

*Id.* at 433-34 (footnote omitted) (quoting *State v. Boehme*, 71 Wn.2d 621, 632-33, 430 P.2d 527 (1967). Neither in *Boyd* nor in the case before us has the State offered any more than mere allegations that the evidence might be improperly disseminated by the defense team. *Id.* at 434. In *Boyd*, we weighed the State's concern that the defense team might disseminate the images against the critical nature of such hard drives in child pornography cases and the potentially exculpatory nature of the evidence. *Id.* at 436-37. We concluded that there is minimal risk of improper dissemination of such images because of defense attorneys' professional responsibilities as officers of the court. *Id.* at 438.

¶9 We also concluded that denying defense counsel such potentially critical exculpatory evidence went beyond merely violating the court rule and had constitutional

implications: "Courts have long recognized that effective assistance of counsel, access to evidence, and in some circumstances, expert witnesses, are crucial elements of due process and the right to a fair trial." *Id.* at 434. Further, "[w]here the nature of the case is such that copies are necessary in order that defense counsel can fulfill this critical role, CrR 4.7(a) obliges the prosecutor to provide copies of the evidence as a necessary consequence of the right to effective representation and a fair trial." *Id.* at 435. Finally, we held that

> adequate representation requires providing a "mirror image" of that hard drive, enabling the defense attorney to consult with computer experts who can tell how the evidence made its way onto the computer. Forensic review might show that someone other than the defendant caused certain images to be downloaded. It may indicate when the images were downloaded. It may reveal how often and how recently images were viewed and other useful information based on where the images are stored on the device. Expert analysis of the application or program used to acquire the images may be useful. Providing a copy enables the expert to test that application or program using the same type and version of computer operating system as was used by the defendant, a difference that may alter how the program runs, stores data, and so forth. Analysis may also reveal that the images are not of children. *This analysis requires greater access than can be afforded in the State's facility.*

*Id.* at 436 (emphasis added) (citations omitted).[6] Nothing in our reasoning in *Boyd* turned on its procedural posture.

---

[6] The dissent would have us revisit this test on the unquestionable grounds that child pornography is a terrible thing. However, the record and argument before us does not support taking that step. Further, there is also evidence that innocent men and women have had their computers pressed into service as storage devices for other people's pornography collections. *See generally* Susan W. Brenner, Brian Carrier & Jef Henninger, *The Trojan Horse Defense in Cybercrime Cases*, 21 SANTA CLARA COMPUTER & HIGH TECH. L.J. 1 (2004); *see also* John Leyden, *How Malware Frames the Innocent for Child Abuse*, THE REGISTER, Nov. 9, 2009, *available at http://www.theregister.co.uk/2009/11/09/malware_child_abuse_images_frame _up/*. Any proposed change to our jurisprudence should consider those dangers too, based on appropriate briefing and argument.

Grenning was entitled to have his defense team take a mirror image of his own computer's hard drives out of the County-City Building to be analyzed by his experts, subject to an appropriate protective order.

REMEDY

¶10 Next, we must determine if Grenning is entitled to relief. The State contends that any error was waived by the defense. After the trial court entered its initial ruling that Grenning was entitled only to access to the computer hard drives subject to significant limitations, Grenning moved for reconsideration. Reconsideration was denied, but the trial judge did suggest a willingness to revisit the issue. Grenning did not ask again, and we must decide whether he was required to do so.

¶11 The State largely relies on *State v. Riker*, 123 Wn.2d 351, 369, 869 P.2d 43 (1994), where we found the defendant had waived an evidentiary challenge by failing to renew it. But *Riker* involved a *tentative* ruling to exclude the testimony of an acquaintance of Riker's. We held that a clearly "tentative" ruling on a motion in limine is not final or preserved for review. *Id.* (citing *State v. Carlson*, 61 Wn. App. 865, 875, 812 P.2d 536 (1991)). Grenning is not challenging an initial motion in limine. He is challenging a denial of his motions to compel discovery for access to copies of his own hard drives. Grenning had twice made motions for access to evidence supported by argument and expert declaration setting forth all of the reasons why the court's approach was unworkable. Further, it was the State's burden to produce the evidence and it was the State's burden to demonstrate the need for a protective order. It was not Grenning's burden to show the restrictions were unworkable. He was not obligated to do more than he did to preserve any error.

¶12 However, the fact that the error was not waived is not enough to compel relief. Grenning argues the court's protective order limiting his access to the evidence

prevented his counsel from providing him effective assistance and, therefore, a fair trial. Generally, we review trial court evidentiary decisions, including decisions on discovery, for abuse of discretion. *City of Auburn v. Hedlund,* 165 Wn.2d 645, 654, 201 P.3d 315 (2009) (citing *State v. Noltie,* 116 Wn.2d 831, 852, 809 P.2d 190 (1991)); *T.S. v. Boy Scouts of Am.,* 157 Wn.2d 416, 423, 138 P.3d 1053 (2006) (citing *John Doe v. Puget Sound Blood Ctr.,* 117 Wn.2d 772, 778, 819 P.2d 370 (1991)). Among other things, discretion is abused if exercised on untenable grounds or for untenable reasons. *T.S.,* 157 Wn.2d at 424 (quoting *State v. Rohrich,* 149 Wn.2d 647, 654, 71 P.3d 638 (2003)). In this case, the trial judges did not have the benefit of *Boyd.* While it is not entirely clear from the record, it appears that both trial judges analyzed the motions under the CrR 4.7(e) standard that we rejected in *Boyd,* 160 Wn.2d at 432. CrR 4.7(e) is a catchall provision that gives trial courts the discretion to grant or deny reasonable requests for material and relevant evidence and the authority to condition disclosure to protect against certain risks. It does not, however, apply to the defendant's *own* "books, papers, documents, photographs, or tangible objects" in the prosecutor's control. CrR 4.7(a)(1)(v); *Boyd,* 160 Wn.2d at 432. Those *must* be disclosed, and in this context, disclosure means a mirror image copy of the hard drives. *Boyd,* 160 Wn.2d at 441.[7]

¶13 By failing to apply CrR 4.7(a)(1)(v), the trial court exercised its discretion on untenable grounds and therefore abused its discretion. An error in a trial is not grounds for reversal unless the error was prejudicial to the defendant. *State v. Cunningham,* 93 Wn.2d 823, 831, 613 P.2d 1139 (1980) (citing *State v. Rogers,* 83 Wn.2d 553, 520 P.2d 159 (1974)). If the error is of constitutional magnitude, the harmless beyond a reasonable doubt standard is applied.

---

[7] Again, we respectfully disagree with the dissent's characterization of the underlying facts. While the trial judge did not have the benefit of our opinion in *Boyd,* if the trial judge had properly applied CrR 4.7(a)(1)(v), mirror images of the hard drives would have been provided to the defense. Since they were not, it appears to us that the trial judge relied on CrR. 4.7(e). But this is not material to our conclusion.

*State v. Nist*, 77 Wn.2d 227, 234, 461 P.2d 322 (1969). A violation of a court rule is generally not considered constitutional error, and we consider whether "the outcome of the trial would have been materially affected" had the error not occurred. *Cunningham*, 93 Wn.2d at 831. The State argues that any error was merely a violation of a court rule and that Grenning is entitled to relief only if his trial would have been materially affected. Grenning, on the other hand, argues that the error was of constitutional magnitude and should be reversed unless we are convinced beyond a reasonable doubt that the error did not contribute to the verdict.

¶14 While it is true that *Boyd* rested on a violation of a court rule, we found that the Fifth and Sixth Amendments to the United States Constitution were implicated and that "[c]ourts have long recognized that effective assistance of counsel, access to evidence, and in some circumstances, expert witnesses, are crucial elements of due process and the right to a fair trial." *Boyd*, 160 Wn.2d at 434. *Boyd* specifically held that "[t]he defendant does not have to establish that effective representation merits a copy of the very evidence supporting the crime charged." *Id.* at 433-34. Instead, we held as a matter of law that "adequate representation requires providing a 'mirror image' of that hard drive." *Id.* at 436. Under *Boyd*, Grenning did not receive adequate—effective—assistance of counsel. That is of constitutional magnitude. *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *see also Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963); *Conde v. Henry*, 198 F.3d 734, 741 (9th. Cir. 1999) (reversing conviction because trial court orders prevented counsel from providing effective assistance).

¶15 Further, the State's proposed rule would, in effect, impose an impossible burden on the defendant since the defendant could only speculate what exculpatory evidence it might reveal. Again, it was the State's duty to produce the evidence under CrR 4.7(a). *Boyd*, 160 Wn.2d at 441. It was the State's burden to establish good cause for a protective

order. CrR 4.7(h)(4); *Rhinehart v. Seattle Times Co.*, 98 Wn.2d 226, 231, 654 P.2d 673 (1982). It did not do so, and we should not treat that lightly. However, Grenning's suggestion that we adopt constitutional harmless error in this context is also unsatisfactory, as it would often result in vacation of convictions where no actual prejudice occurred. ROGER J. TRAYNOR, THE RIDDLE OF HARMLESS ERROR 81 (1970).[8] Fortunately, other standards exist, and we hold that when the State has failed to produce material and information it was obligated to produce pursuant to CrR 4.7(a), the appropriate test is the "overwhelming untainted evidence test." "Under that test, when the properly admitted evidence is so overwhelming as to necessarily lead to a finding of guilt, the error is harmless." *State v. Flores*, 164 Wn.2d 1, 19, 186 P.3d 1038 (2008); *see also* Dennis J. Sweeney, *An Analysis of Harmless Error in Washington: A Principled Process*, 31 GONZ. L. REV. 277 (1995).[9]

¶16 In this case, the *only* evidence on the possession charges was the untested pictures themselves. We cannot say that the result would have been the same if Grenning's expert had been allowed to bring his full expert force to bear on the evidence. We simply do not know what would have been found. Detective Voce spent more than 200 hours working on Grenning's computer and testified extensively about the structure of the computer and the implications of the fact that the pictures were found on "unallocated"

---

[8] In determining the proper standard on review, we are mindful of Chief Justice Traynor's caution:

> The practical objective of tests of harmless error is to conserve judicial resources by enabling appellate courts to cleanse the judicial process of prejudicial error without becoming mired in harmless error. The grand objective is to conserve the vitality of the rules and procedures designed to assure a fair trial. Only when the law is the soul of fairness can it be truly the soul of reason.

TRAYNOR, *supra*, at 81.

[9] We respectfully disagree with the dissent that this is the same as the constitutional harmless error standard.

space, which generally means that they had been deleted. This testimony was essentially untested by the defense.[10]

¶17 Grenning asks for reversal and retrial or, in the alternative, dismissal. But outside of reversal for insufficiency of the evidence (which he does not argue to this court), outright dismissal is rarely granted. *Cf. State v. Michielli*, 132 Wn.2d 229, 243, 937 P.2d 587 (1997) (affirming dismissal when the prosecutor added new charges days before trial, forcing defendant to waive speedy trial rights or proceed without opportunity to prepare a defense); *State v. Sherman*, 59 Wn. App. 763, 769, 801 P.2d 274 (1990) (dismissal based on State's discovery violations). We have been offered no reason to believe the particular evidence at issue has not aged well or that the State deliberately withheld evidence it knew or should have known that Grenning was entitled to have.[11] Dismissal is not appropriate.

## CONCLUSION

¶18 In summary, we hew to our holding in *Boyd*. In cases where the defendant's own computer is seized, analyzed by

---

[10] While it is not before us, at least based on our cursory review of the trial record, it appears that ample evidence supports the remaining charges. One of the victims and his mother and brother testified as did the mother and doctor of the other, who was deemed too young to testify. The court also admitted a transcript of an Internet chat that Grenning had had with another man where he described in detail drugging, molesting, and raping one of the victims. In his own statement of additional grounds, Grenning admits the acts took place though he disputes the number of charges filed. The Court of Appeals, which reversed the possession charges for the *Boyd* error, also specifically rejected Grenning's claim that there was insufficient evidence to convict him of possession of child pornography. *Grenning*, 142 Wn. App. at 537. Of course, if forensic review of the computer does uncover exculpatory evidence, Grenning will have an opportunity to raise it in a personal restraint petition.

[11] In his supplemental brief, Grenning argues for the first time that the protective order was structural error. "A structural error resists harmless error review completely because it taints the entire proceeding." *State v. Levy*, 156 Wn.2d 709, 725, 132 P.3d 1076 (2006). Structural errors include things like relieving the State of its burden of proof, denying a public trial, and denying counsel. *See Sullivan v. Louisiana*, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993); *Waller v. Georgia*, 467 U.S. 39, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984); *Gideon*, 372 U.S. 335. Grenning cites no case where something like an overbroad protective order has been deemed a structural error, and we found none ourselves.

the State, and used as evidence, the defendant is entitled to a mirror image copy of the hard drives for analysis by the defendant's expert at an appropriately secured laboratory. Concerns about security of the evidence and the possibility of any copies being disseminated may be addressed by an appropriate protective order requiring defense counsel to maintain logs of those who have access to the evidence and to return all copies of images and other evidence at the conclusion of the case. Grenning made two motions to have access to his own computer hard drive so that his expert could test the State's evidence without compromising his attorney's work product. It was the State's duty to produce the mirrored copies of the hard drives, and it was the State's burden to show why a protective order was necessary. Grenning was not required to do more to preserve the error. Under these circumstances, the appropriate test is the "overwhelming untainted evidence test" to determine whether a trial court's erroneous ruling requires reversal. Under that test, he is entitled to a new trial on the 20 counts of possession of depictions of minors engaged in sexually explicit conduct with sexual motivation. We affirm the Court of Appeals and remand to the trial court for further proceedings consistent with this opinion.

C. JOHNSON, SANDERS, OWENS, FAIRHURST, and STEPHENS, JJ., concur.

¶19 MADSEN, C.J. (dissenting) — The majority's mistakes of fact and law lead to the wrong conclusions and the wrong result in this case. Contrary to the majority's assertion that the defense expert refused to examine the defendant's computer under the trial court's discovery and protective orders, *nothing* in the record supports the claim that the defendant's expert refused to work under the court's protective order.

¶20 As to the law, the majority misapplies our precedent and erroneously reaches the conclusion that the State must

turn over to the defendant mirror images of his hard drives in order to comply with CrR 4.7(a)(1)(v) and the constitutional rights to due process and effective representation. And, because the State did not give copies of mirror image hard drives to the defendant, the majority concludes that error occurred. I strongly disagree. The trial court's orders in this case conform to rule and constitutional requirements, and the State provided full opportunity for the defendant to engage in discovery. Moreover, the defendant made no attempt to engage in the discovery process about which he now complains.

¶21 The majority then says that it will not apply a constitutional harmless error standard in this case because to do so would require reversal in every case of this type. The majority is wrong both as to what the constitutional harmless error test is and how it applies. Then, in a confounding twist in its analysis, the majority in fact applies the very harmless error test it says it will not apply. Notwithstanding, it is apparent that the majority believes that reversal is not required unless the defendant is prejudiced as a result of being denied the discovery that the majority says is necessary but not provided. The majority decides that the defendant was prejudiced. But the defendant has not merely made an insufficient showing of prejudice, he has made *no showing* of prejudice in this case. Reversal is not required.

¶22 I would hold that the defendant was provided with discovery as required by CrR 4.7(a)(1)(v), that he received due process and effective representation, and would therefore affirm his convictions on 20 counts of possession of depictions of a minor engaged in sexually explicit conduct of child pornography. But, even assuming that the State failed to provide discovery that should have been provided, any error was not reversible error because the defendant has not shown that he was prejudiced.

## Analysis

¶23 At issue is whether the defendant's convictions on 20 counts of possession of depictions of a minor engaged in sexually explicit conduct, based upon possession of 20 images of commercial child pornography, must be reversed because the defense was not provided with mirror images of the hard drives in his computer where the images were stored. The majority holds, based upon *State v. Boyd*, 160 Wn.2d 424, 432, 158 P.3d 54 (2007), that the State failed to provide discovery mandated under CrR 4.7(a)(1)(v). The majority therefore reverses the 20 convictions for possession of child pornography and remands for a new trial on these charges.

## Facts

¶24 The majority's recitation of facts in this case is erroneous in many respects. The misstated facts make this appear to be a case where the defense had great difficulty in obtaining an expert and gaining access to the discovery to which it is entitled. This is simply not the case.

### The defendant was able to retain an expert

¶25 The majority says that the defendant was unable to obtain an expert to examine the hard drives. The record does not support this conclusion. At the time that the defense moved to compel discovery in July 2003, an expert from Spokane had been hired to assist the defense, Ramona Lawson of Global CompuSearch. But early in September 2003, at a hearing on a motion for a continuance, defense counsel explained that Ms. Lawson declined to continue as the defense expert. The judge at this hearing was provided various explanations, including that the expert was unwilling to provide the required blank drives (and thus discovery could not go forward under the orders) because she was uncertain of being reimbursed for them (State's explanation

based on conversation with defense investigator), that matters of time and distance were problems given her location in Spokane, and that she refused to work under the conditions of the protective order (defense counsel's explanation). These explanations were not, as the trial judge observed, supported by any declaration from the expert herself but rather were "only secondhand statements as to what the potential problem is." Verbatim Tr. of Proceedings at 13 (Sept. 2, 2003). On March 26, 2003,[12] when the defense motion to reconsider the discovery orders was heard, defense counsel again represented to the court that Lawson declined to work on the case given the restrictions in the order. Again, there is no suggestion that any declaration to this effect from Ms. Lawson was filed. Thus, at the end of the day, the *record* does not tell us why Ms. Lawson declined to continue as a defense expert.[13]

¶26 The only other expert that this record shows the defense contacted is Robert Apgood.

The record does not support the conclusion that defendant's expert refused to work under the protective order or that he refused to conduct a forensic evaluation at a state facility

¶27 The majority says that the defense had "considerable difficulty" finding an expert who would work under the protective order. Majority at 51. The only source of this information is defense counsel because there are no declarations or other evidence in the record that supports this statement.

¶28 The majority says that Mr. Apgood "declined to examine the hard drives at the County-City Building." *Id.*

---

[12] The March 26, 2003, transcript is erroneously dated September 24, 2003.

[13] Evidently, a declaration from Ms. Lawson was filed in connection with the defendant's motion to compel discovery regarding the need for "true mirror images copies of the zip disks and hard drives." Clerk's Paper's (CP) at 107-08 (defendant's motion to compel discovery); *see also* CP at 601 (reference to this declaration appearing in the Robert Apgood declaration). However, this declaration is not in the record. In any event, upon granting the motion to compel and issuing the protective order, the trial court did in fact order that mirror image copies of the hard drives be made.

at 51-52. *Absolutely nothing* in the record supports this statement. Mr. Apgood provided a declaration that was submitted to the trial court in connection with the defense motion for reconsideration of the discovery and protective orders, but he *never* said that he would not examine the hard drives at the state facility.

¶29 Because the majority accepts so much of what is in this declaration, however, it bears a closer examination. Mr. Apgood, who is also an attorney, provided a great deal of argument about how he believed that due process would be violated if he were "monitored" and "supervised" when examining the copies of the hard drives and if his activities on a state computer were recorded and ascertained by the State. The majority apparently accepts these statements at face value because it quotes Apgood's statements expressing concerns about the sanctity of the attorney work-product doctrine if his work were supervised or reviewed by the government after he was finished. *Id.* at 51.

¶30 It is unusual for a defense expert to submit a declaration that is in all pertinent respects a legal brief on behalf of the defendant. In any event, Apgood made this declaration without regard to the actual conditions of the protective order itself. The protective order contained restrictions on the State that prevented the State from learning anything about the defense's forensic evaluation of the mirrored drives the State was to provide under the discovery order. The computer into which the mirrored drives were to be installed could not be connected to a network or a printer, except as necessary to print non-graphic files such as text files, log files, and directory trees. The defense expert had to be present when any printer was connected. A copy of the protective order had to remain with the mirrored drives. Once the forensic evaluation was complete, the State's computer forensics expert, Detective Richard Voce, was to be notified and he was required to place the mirrored drives in the Pierce County property room where they would be stored until the case was completed. The State was barred from viewing any of the

data on the mirrored drives and was barred from attempting to determine what type of forensic evaluation had been conducted.

¶31 Under the protective order, Mr. Apgood's work would not have been supervised, nor would the government have been able to review the work he did. Therefore, most of the legal argument in the declaration was without any basis in fact.

¶32 Apgood also expressed concerns about the financial burden that the public would have to bear if the forensic evaluation occurred in a state facility as opposed to his own lab. But there is absolutely nothing in this case that even hints that costs impacted the defense's ability to conduct an investigation and prepare for trial. In fact, Mr. Grenning was and is indigent, and his expenses at trial and on appeal have been at public expense.

¶33 As mentioned, Apgood's declaration reads more like a legal brief in support of reconsideration of the protective order than information about whether the expert could carry out a forensic examination of the mirror drives under the protective order. Indeed, in ruling on the motion for reconsideration, Judge Vicki Hogan stated that much of what is in the declaration did not bear on the question whether the protective order was workable. The judge commented that matters "of inconvenience or additional costs" or "extra work" did not "address the real issue and that is what has happened since November when Mr. Apgood has been on board, and nothing has happened. Even under the existing order there has been no effort to try to comply with that order. So I am going to deny the motion for reconsideration at this time. . . . I want to know if that is unworkable." 4 Verbatim Report of Proceedings (VRP) at 84-85 (Mar. 26, 2003 (incorrectly dated Sept. 24, 2003)).

There was no evidence or argument that any images of commercial child pornography were not of actual children

¶34 The majority indicates that there was evidence and argument on the issues whether any of the commercial

child pornography images were of "virtual children" as opposed to actual children and whether multiple images were stills from a single movie. Majority at 52 & n.2.

¶35 The testimony to which the majority refers, majority at 52 n.2, is testimony about images of the younger of Grenning's two victims of sexual assault, not testimony about images of commercial child pornography. *See* 4 VRP at 553 (June 15, 2004). This testimony is totally unrelated to the 20 counts of possession of depictions of a minor engaged in sexually explicit conduct that are at issue here. And contrary to the majority's implication, there was no defense argument alluding to possible "virtual children" in the images on which these 20 counts were based, either. After addressing in closing argument the charges involving the actual assaults by the defendant in his home and on a camping trip against the two young victims, defense counsel turned to discussing the possession counts, and nothing after this transition in the argument remotely suggests that counsel was talking about either videotapes or movies, or "virtual" images of children in connection with the possession counts. *See* 7 VRP at 946-56 (June 18, 2004) (defense closing argument); *id.* at 953 (transition in argument from counts involving the two live victims of sex offenses to argument about the 20 counts of possession of commercial child pornography).

¶36 The majority references nothing in the record that supports the majority's suggestion that there was an issue about whether the images of commercial child pornography were of "virtual," not real, children, or whether multiple images of commercial child pornography were "stills" from a videotape or movie.

## The trial judges did not erroneously analyze the defendant's discovery motions under CrR 4.7(e)

¶37 The majority's next factual misstatement is that "[w]hile it is not entirely clear from the record, it appears that both trial judges analyzed the motions [evidently the motion to compel discovery and the motion for reconsidera-

tion] under the CrR 4.7(e) standard that we rejected in *Boyd*." Majority at 57. The majority also says that "[b]y failing to apply CrR 4.7(a)(1)(v), the trial court exercised its discretion on untenable grounds and therefore abused its discretion." *Id.*

¶38 Contrary to the majority, the record shows that the trial judges apparently applied the correct part of the rule. It certainly should not be said, as the majority does, that it appears the judges erroneously relied on subsection (e). In the hearing on the defendant's motion to compel discovery, defense counsel expressly argued that the requested material is clearly covered under CrR 4.7(a)(1)(v), reading aloud to the court the text of the rule. The State disputed only the meaning of the term "shall disclose" in this part of the rule. Report of Proceedings (RP) at 12 (Mot. to Compel Hr'g July 25, 2003); *see also* Clerk's Papers (CP) at 610-11 (where in a January 23, 2004 letter to defense counsel the prosecuting attorney stated the State's position about what "CrR 4.7(1)" requires [sic, should be 4.7(a)(1)]). Nothing in the court's comments suggests that the trial court disagreed with the parties' argument that the motion was controlled by CrR 4.7(a)(1)(v). The majority is attempting to make this case appear to be like *Boyd*. It is not.

### *Boyd* is distinguishable on the facts

¶39 *Boyd* is unlike the present case in other key respects. Most significantly, the protective order in *Boyd* permitted the defense only two sessions of forensic examination of the mirror image hard drives in that case. *See* Pet'r's Mot. for Discretionary Review, App. A, *State v. Boyd*, 160 Wn.2d 424 (No. 79371-9). In contrast, the defense in the present case was not limited in its forensic examination of the mirrored hard drives.

¶40 Factually the cases are distinct. During the July 25, 2003 hearing on the defense motion to compel discovery in the present case, the State's attorney explained that it never turned over child pornography to anyone outside law enforcement as a matter of policy in consideration of the

interests of the victims and to avoid possible further distribution of the materials. When the trial court granted the defendant's request to compel discovery, it issued a protective order that recognized the importance of this policy concern, while at the same time providing the defense with access to the evidence on which the State relied. Under the protective order, the data contained on the mirrored drives could not be removed from the secured facility without the permission of the court and could be viewed only by defense counsel, the expert, and the defendant (the defendant could do so only in the presence of counsel).

¶41 But unlike in *Boyd*, there was no limitation on the defense's access to the mirror image hard drives for forensic evaluation. Indeed, the trial judge granting the motion to compel discovery and issuing the protective order commented, "The state is offering unlimited access as long as" the material is not copied. RP at 24 (July 25, 2003). The only limitation on time for evaluation was to business hours, 8:30 a.m. to 4:30 p.m., Monday through Friday, but this is hardly the same as the situation in *Boyd*. Moreover, the record shows that the State indicated its willingness to try to accommodate the defense if access was sought at night or on the weekends.[14]

¶42 In summary, there are numerous factual misstatements in the majority opinion, with the most egregious being the statement that the defense expert refused to examine the mirrored hard drives at the County-City Building, which simply is not supported by the record.

Legal Analysis

The protective order is valid

¶43 Turning to the legal principles that are unfortunately either misstated or misapplied, the majority rejects, as did the court in *Boyd*, the argument that the possibility

---

[14] In addition, under the protective order, the defense expert was permitted reasonable access to the defendant's *original* computer, in the presence of Detective Voce.

that material may be disseminated on the Internet if released in the form of a copied hard drive justifies a protective order. The majority says "that there is a minimal risk of improper dissemination of such images because of defense attorneys' professional responsibilities as officers of the court." Majority at 54 (citing *Boyd*, 160 Wn.2d at 438). But the risk is significant. As Congress has determined, there is a large risk of child pornography being distributed. And unfortunately the professional responsibilities of attorneys have not prevented some attorneys from being involved with child pornography. The majority engages in wishful thinking when it concludes that because an attorney is an officer of the court, he or she will not be or become part of the Internet trafficking in child pornography.

¶44 The fact is that those who engage in illegal conduct concerning child pornography come from all walks of life, and some attorneys do not refrain from such conduct because of their professional obligations. Even a brief search shows numerous cases where attorneys have engaged in illegal conduct involving child pornography. *See, e.g., In re Raquet*, 870 N.E.2d 1048 (Ind. 2007); *In re Conn*, 715 N.E.2d 379 (Ind. 1999); *Iowa Supreme Court Attorney Disciplinary Bd. v. Blazek*, 739 N.W.2d 67 (Iowa 2007); *In re Gackle*, 283 Kan. 502, 153 P.3d 493 (2007); *In re Sosnowski*, 197 N.J. 23, 961 A.2d 697 (2008); *In re St. Clair*, 32 A.D.3d 170, 821 N.Y.S.2d 684 (2006); *Disciplinary Counsel v. Ridenbaugh*, 122 Ohio St. 3d 583, 2009-Ohio-4091, 913 N.E.2d 443; *In re Disciplinary Proceedings Against Winch*, 2009 WI 64, 318 Wis. 2d 408, 769 N.W.2d 474.

¶45 Moreover, further dissemination of child pornography is a valid concern. Both trial judges who considered the matter reasonably concluded that protecting the minor victims of Grenning's sexual assaults from further victimization on the Internet demanded a protective order as the State requested. The same concern was part of the reason that Congress enacted the Adam Walsh Child Protection and Safety Act of 2006 (Adam Walsh Act), which limits a defendant's access to property or material constituting

child pornography. Pub. L. No. 109-248, 120 Stat. 587, 629 (2006). A provision of this act, 18 U.S.C. § 3509(m), limits access to discovery materials by requiring that material that constitutes child pornography must remain in the care, custody, and control of the government or a court, and a court shall deny any defense request to copy, photograph, duplicate, or otherwise reproduce the material "so long as the Government makes the property or material reasonably available to the defendant." 18 U.S.C. § 3509(m)(1), (2)(A).

¶46 The Adam Walsh Act does not apply in the present case, but the findings underlying the act are highly relevant to the question whether the protective order in this case was valid. In its findings Congress determined that "[t]he illegal production, transportation, distribution, receipt, advertising and possession of child pornography . . . is harmful to the physiological, emotional, and mental health of the children depicted in child pornography and has a substantial and detrimental effect on society as a whole." Pub. L. No. 109-248, § 501(1)(A). Congress also found that "[t]he government has a compelling State interest in protecting children from those who sexually exploit them, and this interest extends to stamping out the vice of child pornography at all levels in the distribution chain." *Id.* at (2)(C). *"Every instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse." Id.* at (D) (emphasis added).

¶47 Congress was quite concerned about the ease with which child pornography can be distributed, specifically finding that "[t]he advent of inexpensive computer equipment with the capacity to store large numbers of digital images of child pornography has greatly increased the ease of possessing child pornography," contributing to the increased market in child pornography. *Id.* at (1)(C).

¶48 The potential for repeated victimization of the children whose images are child pornography stored on computer hard drives was a legitimate basis for the trial judges in this case to issue the protective order and to deny the defendant's motion for reconsideration. Not only is this

true as a general proposition, it is true based on the specific facts in this case. At the hearing on the motion to compel discovery, the trial judge was advised that the impetus for the State's investigation of illegal sexual acts involving the elder of Grenning's two victims of sexual assault, including rape, was an inquiry from federal police in Australia. During an investigation involving child pornography, the Australian police had seen pictures of this child, which Grenning took while on a camping trip. At the end of the hearing, the trial judge expressed concern about the first victim and the fact that this "four- or five-year-old victim is depicted in these photographs, and I feel some obligation to protect his image from making it into the mainstream of the market of child pornography." RP at 23 (July 25, 2003).

¶49 Thus, the judge considered not only the potential for images appearing on the Internet and victims being revictimized, a legitimate concern in and of itself, she also had knowledge that dissemination of images had already occurred with respect to one of the two children that Grenning (at that point in time) allegedly had raped.

¶50 Because it is an unfortunate fact of life that some attorneys, as with members of any other profession or field of work, can be involved in illegal viewing, collection, and distribution of child pornography, and because revictimization of the children who are the victims of child pornography is a legitimate and very real concern, the majority's rejection of the reason for the protective order is legally unsound. Ultimately, the majority emphasizes the mandatory nature of the discovery rule in CrR 4.7(a)(1)(v) but gives little regard to the rule's provision regarding protective orders. The rule provides that "[e]xcept as otherwise provided by protective orders or as to matters not subject to disclosure, the prosecuting attorney shall disclose" the listed items. CrR 4.7(a)(1). By summarily dismissing the reasons for the protective order, the majority is able to focus solely on the mandatory language of the rule. But even as to the listed items in the rule that "shall" be disclosed, discovery is subject to protective orders.

¶51 Moreover, the protective order in this case did not bar discovery at all. Rather, it allowed full discovery of the defendant's hard drives via mirrored hard drives. As explained above, nothing in the record shows that the defendant's expert could not conduct a forensic evaluation of the drives at the County-City Building. It may have been more convenient for the expert to have copies of the three hard drives, but not having them did not prevent discovery from occurring. In the end, we do not know why the defense did not carry through on discovery, nor do we know why Mr. Apgood did not testify at trial. It appears, however, that he continued to work on behalf of the defense because he apparently was involved in making a list of inquires that were included in a "formal discovery request" in a letter to the prosecuting attorney dated May 7, 2004. CP at 463-64; *see* 1 VRP at 3-5, 20-22 (May 7, 2004).

## The defendant's constitutional rights were not violated by the discovery and protective orders

¶52 Next, the discovery and protective orders in this case did not impinge on Mr. Grenning's constitutional rights to due process and effective representation, contrary to the majority's belief. Notably, Mr. Grenning relies on federal constitutional principles in arguing that his constitutional rights have been violated as a result of the discovery and protective orders. In the analogous context of the Adam Walsh Act, courts have repeatedly found no unconstitutional infirmity. As mentioned, this federal law forbids turning over copies of hard drives to defendants as part of the discovery process and requires that discovery of such materials take place in a secure government facility, provided the materials are made reasonably available to the defendant. Materials are deemed to be "reasonably available" if the government provides "ample opportunity for inspection, viewing, and examination at a government facility of the property or material by the defendant, his or her attorney, and any individual the defendant may seek to qualify to furnish expert testimony at trial." 18 U.S.C. § 3509(m)(2)(B).

¶53 This law has been subjected to numerous constitutional challenges, all of which have been rejected by the courts. Every court that has considered whether a requirement that materials be viewed in a government facility violates due process or the right to effective representation has held the law is constitutional, generally considering the effective representation claims under a "due process umbrella." *See, e.g., United States v. Spivack*, 528 F. Supp. 2d 103 (E.D.N.Y. 2007) (challenges considered under due process framework rejected); *United States v. Cameron*, 672 F. Supp. 2d 133 (D. Me. 2009); *United States v. Tyson*, No. 06-CR-6127, 2007 WL 2859746 (W.D.N.Y. Sept. 26, 2007) (unpublished) (statutory language consistent with the requirements of due process); *United States v. Knellinger*, 471 F. Supp. 2d 640 (E.D. Va. 2007) (rejecting facial and as applied due process challenges to Adam Walsh Act); *United States v. Sturm*, 560 F. Supp. 2d 1021, 1028 (D. Colo. 2007) ("[t]he requirements of [the Adam Walsh Act] are consistent, if not coterminous, with the due process guarantee"); *United States v. O'Rourke*, 470 F. Supp. 2d 1049 (D. Ariz. 2007) (rejecting facial and as applied due process challenges to Adam Walsh Act); *United States v. Doane*, 501 F. Supp. 2d 897 (E.D. Ky. 2007) (Adam Walsh Act comports with due process); *United States v. Battaglia*, No. 5:07cr005, 2007 WL 1831108 (N.D. Ohio June 25, 2007) (unpublished) (same); *United States v. Butts*, No. CR 05-1127-PHX-MHM, 2006 WL 3613364 (D. Ariz. Dec. 6, 2006) (unpublished) (same); *United States v. Johnson*, 456 F. Supp. 2d 1016 (N.D. Iowa 2006) (finding 18 U.S.C. § 3509(m) constitutional on its face and as applied, and statute's requirement that child pornography used in criminal trials remain in possession of government or court not unduly burdensome on rights of defendants to fair trials).

¶54 The importance of these cases to the present case is that they demonstrate that there is no constitutionally based absolute prohibition on requiring a defendant, his counsel, or his expert to view images from the defendant's computer in a secure government facility.

¶55 It must be remembered, though, that the federal law requires that the defendant have an ample opportunity for inspecting, viewing, and examining materials at a government facility (it is this aspect of the federal law that has convinced the courts that there is no constitutional infirmity in the law). If this cannot be done in a federal facility, then, and only then, has it been held that the defendant must be given a mirror copy of the hard drives to examine elsewhere. *Knellinger*, 471 F. Supp. 2d 640; *see also, e.g.*, *Battaglia*, 2007 WL 1831108, at *4 (pursuant to the requirement that the prohibition of 18 U.S.C. § 3509(m) applies only so long as the government makes the property or material reasonably available to the defendant, subsection (m)(2)(A), if the government does not make the property or material reasonably available, then the prohibition on obtaining copies does not apply; under the facts, however, ample opportunity was provided).

¶56 Given this aspect of the federal law, whether a constitutional violation exists in a particular case is essentially determined by asking whether the defendant has been denied reasonable access to the evidence in a child pornography case. Comparison to federal cases in the context of the Adam Walsh Act on this analogous point shows that Grenning had more than an adequate opportunity to engage in discovery. *See Battaglia*, 2007 WL 1831108, at *6; *United States v. Renshaw*, No. 1:05-CR--00165, 2007 WL 710239 (S.D. Ohio Mar. 6, 2007) (unpublished); *Tyson*, 2007 WL 2859746, at *2; *Spivack*, 528 F. Supp. 2d at 107.[15] That being the case, and contrary to the majority's reasoning, the conclusion should be drawn that the discovery and protective order in this case did not violate Grenning's constitutional rights, nor were the orders improper.

---

[15] Cases decided under the federal discovery rule and predating the Adam Walsh Act support the conclusion that copies of child pornography materials do not have to be turned over to the defense. *See United States v. Kimbrough*, 69 F.3d 723, 731 (5th Cir. 1995) (rule did not require that contraband be distributed to or copied by the defense); *United States v. Horn*, 187 F.3d 781, 792 (8th Cir. 1999) (same); *United States v. Husband*, 246 F. Supp. 2d 467 (E.D. Va. 2003) (same); *United States v. Cox*, 190 F. Supp. 2d 330, 334 (N.D.N.Y. 2002).

¶57 Here, as explained, Mr. Apgood's declaration shows that the request for copies of the hard drives was made for reasons of costs and convenience. Apgood explained that if he conducted the evaluation in his own lab, he would not have to bill for downtime during which his lab equipment could be left unattended to process Grenning's hard drives because he could do other things during that time. He raised concerns about government monitoring or supervision. He indicated that it is not in the interests of "judicial economy" to require the defense expert to conduct the analysis in state facilities. CP at 603. He said it was "arguable that at least some of the images allegedly recovered" from Grenning's computer are manufactured images. CP at 605.

¶58 None of these concerns supports Mr. Grenning's argument that he has been *denied* the opportunity to evaluate the evidence against him, which has consistently been his argument. Nothing in the declaration, or the rest of the record, supports the conclusion that Grenning's expert refused to examine the mirror copies of the hard drives at the government facility. There is no showing that costs would have affected the expert's ability to assist the defense—Grenning was indigent. Convenience to the expert or defense counsel is not a basis for releasing copies of the hard drives to the defense, as the trial judge properly concluded. As one court said, the defense should not be "able to manipulate" the requirement that discovery take place in a federal facility in accord with 18 U.S.C. "§ 3509(m) by merely positing conceptual difficulties to be encountered at government facilities, or mere preferences to use their own." *United States v. Flinn*, 521 F. Supp. 2d 1097, 1102 (E.D. Cal. 2007). The same can be said in this case with respect to Apgood's declaration in relationship to the discovery and protective orders.

¶59 As to the matter of a "virtual child defense," the majority's implication that the defense tried to raise a "virtual child" defense is unsupported by the record, as explained above. Further, Grenning did not raise a "virtual

child" defense at any point where it could have been considered in connection with discovery. Despite the fact that the State repeatedly invited defense counsel to view the images from the hard drives, defense counsel did not do so until June 8, 2004, just days before the jury trial began. To the extent that any images raised any questions about a "virtual child defense,"[16] the defense could have known this long before trial, as opposed to pure speculation about a possible issue. The discovery and protective orders did not prevent the defense from looking at the images of the children.

¶60 There is no basis to conclude on this record that access to mirror copies of the three hard drives from Grenning's computer in the state facility would be in any way inadequate. There is no evidence that access permitted in the County-City Building would not have allowed a defense expert to conduct a forensic evaluation of the evidence or otherwise assist the defense.

¶61 The discovery and protective orders in this case were properly issued and valid, and in particular the protective order was justified given the trial courts' concerns about not permitting additional copies to be released and possibly proliferated on the Internet. I would hold that the orders complied with CrR 4.7(a)(1)(v) and accordingly I would affirm Grenning's convictions for possession of child pornography.

## Even if error occurred, it was harmless

¶62 But even assuming there was error, it was not reversible error. Initially, as mentioned, the majority's approach to the harmless error issue is confusing. The majority first observes that decisions on discovery are generally reviewed for abuse of discretion. Majority at 57.

---

[16] As noted above, the majority suggests that there is a question about whether the commercial images were of real children or instead were images that had been manipulated into appearing as if they were or were "stills" from a single movie. Majority at 52 & n.3 (citing testimony of Detective Voce in response to prosecutor's questions). As explained, this is simply not what the record shows.

Then the majority decides, erroneously, that the trial courts issuing the discovery and protective orders and denying reconsideration of those orders abused their discretion by applying CrR 4.7(e). *Id.* at 57. Then the majority states that error in a trial is not grounds for reversal unless the defendant was prejudiced, and this standard generally applies to questions of court rule violations, which usually are not considered constitutional error. *Id.* at 57-58. Then the majority says that Grenning did not receive adequate representation of counsel, which is of constitutional magnitude. *Id.* at 58.

¶63 But then the majority says that the constitutional harmless error standard should not apply because it would "often result in vacation of convictions where no actual prejudice occurred." *Id.* at 59. Then the majority applies the constitutional harmless error standard anyway, deciding that the proper test is whether there is " 'overwhelming untainted evidence' " that necessarily leads to guilt. *Id.* (citing *State v. Flores*, 164 Wn.2d 1, 19, 186 P.3d 1038 (2008)); *see State v. Guloy*, 104 Wn.2d 412, 425-26, 705 P.2d 1182 (1985) (adopting " 'overwhelming untainted evidence test' " for constitutional error).

¶64 I believe that the majority is correct in concluding that the constitutional harmless error test does not apply. Accordingly, I would not apply the "overwhelming untainted evidence test." Further, I would not apply the constitutional harmless error standard that applies in the case of due process violations resulting from the government's failure to disclose exculpatory evidence. As the State points out, due process requires the State to disclose "evidence that is both favorable to the accused and 'material either to guilt or to punishment.' " *United States v. Bagley*, 473 U.S. 667, 674, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985) (quoting *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)).

¶65 There was no such due process violation in this case. If the defendant, using reasonable diligence, could have obtained the information, there is no *Brady* violation. *In re*

*Pers. Restraint of Benn*, 134 Wn.2d 868, 916, 952 P.2d 116 (1998). Because Grenning had a retained expert and the expert never said he could not conduct a forensic evaluation at the State facility, using reasonable diligence Grenning could have obtained the evidence via the copied hard drives.

¶66 Further, the evidence must be material, which means that if the evidence had been disclosed, there is a reasonable likelihood that the outcome of the proceeding would have been different. *Bagley*, 473 U.S. at 682; *Benn*, 134 Wn.2d at 916. Since Grenning never availed himself of the opportunity to examine mirrored copies of the hard drives, there is no basis for concluding that the evidence was material, i.e., that the failure to disclose the evidence undermines confidence in the outcome of the trial. Also, the trial judge denying Grenning's motion for reconsideration of the discovery and protective orders told the defense to inform the court if the protective order was unworkable. The defense never advised the court that it was unworkable. In *State v. Dictado*, 102 Wn.2d 277, 298-99, 687 P.2d 172 (1984), *overruled on other grounds by State v. Harris*, 106 Wn.2d 784, 725 P.2d 975 (1986), the court rejected the defendant's claim that he was constitutionally entitled to police " 'rough notes' " because the trial judge had directed defense counsel to discuss with the prosecution the matters involved and if not satisfied to further inform the court. Because "[n]o additional requests for information were made," this court determined that the "[d]efendant has not shown that constitutionally material information remained undisclosed." *Id.* at 299.

¶67 Nor do I believe that *Boyd*'s discussion of the right to effective representation requires any heightened standard of review because the defendant here was in fact provided the opportunity to access mirror copies of the hard drives and therefore cannot legitimately complain about inadequate representation.

¶68 The appropriate standard for the assumed error in this case, a violation of CrR 4.7(a)(1)(v), is whether the defendant suffered prejudice, which is the standard that

applies to a rule violation, as the majority says. Majority at 57-58. The question is whether the outcome of the trial would have been materially affected if the error had not occurred.

¶69 Mr. Grenning does not claim he was prejudiced, and he makes no attempt to show that in the absence of error the outcome of the trial would have been different. He instead contends that reversal is automatically required. I agree with the majority that his requested remedy is improper. Having failed to even allege prejudice, Grenning clearly has not shown prejudice and he is not entitled to reversal of his convictions on 20 counts of possession of depictions of a minor engaged in sexually explicit conduct.

Upholding the discovery and protective orders comports with *Boyd*

¶70 Finally, I return to *Boyd*. As explained there, the purpose of the CrR 4.7(a)(1)(v) disclosure requirement is to protect the defendant's interests in obtaining meaningful access to evidence of the crimes charged for purposes of effective trial preparation and adequate legal representation. *Boyd*, 160 Wn.2d at 432. These purposes were satisfied in this case. There must be "meaningful access to copies based on fairness and the right to adequate representation." *Id.* at 433. This concern was satisfied in this case. "CrR 4.7(a) obliges the prosecutor to provide copies of the evidence as a necessary consequence of the right to effective representation and a fair trial." *Id.* at 435. As explained, the State stood ready to make copies of the hard drives and have them available for Grenning's defense team to forensically examine them. The State has the burden of establishing the need for appropriate restrictions; the defendant does not have to show that a copy of the evidence must be provided for effective representation. *Id.* at 433-34. The State provided sufficient grounds for restricting dissemination of copies of the hard drives, and the trial court therefore appropriately issued the protective order that required that the forensic evaluation take place in the County-City Building.

¶71 For all of the reasons set forth in this opinion, I disagree with the majority's recitation of the facts, its legal analysis, and its result. I dissent.

ALEXANDER and J.M. JOHNSON, JJ., concur with MADSEN, C.J.