IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 39755-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| CHRISTOPHER EDWARD DODSON, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J.P.T.[†] — In *Smith v. Arizona*, 602 U.S. 779, 144 S. Ct. 1785, 219 L. Ed. 2d 420 (2024), the United States Supreme Court clarified that the confrontation clause bars a testifying expert from relying on the work prepared by a nontestifying expert when the testifying expert renders an opinion for the jury. In *State v. Hall-Haught*, 4 Wn.3d 810, 569 P.3d 315 (2025), the Washington Supreme Court, bound by United States Supreme Court precedent, joined the nation's high Court in the same ruling. In this case, tried before the release of *Smith v. Arizona* and *State v. Hall-Haught*, the trial court, over the objection of appellant Christopher Dodson, allowed Washington State Patrol

---

[†] George B. Fearing, a retired judge of the Washington State Court of Appeals, is serving as a judge pro tempore of this court pursuant to RCW 2.06.150(1).

Toxicology Laboratory scientist Andrew Gingras to testify to blood content test results emanating from tests conducted by a second scientist, Kelly Daniel, who did not testify. On appeal, Dodson seeks reversal of his conviction for vehicular homicide based on a State breach of the confrontation clause. The State, in turn, seeks to distinguish the facts in *Smith v. Arizona* and *State v. Hall-Haught*. This effort by the State demands that we submerge ourselves into the intricacies of blood testing. Christopher Dodson also contends the trial court should not have allowed into evidence any test results because of the storing of blood in a vial beyond the vial's expiration date.

We conclude that *Smith v. Arizona* and *State v. Hall-Haught* control. Andrew Gingras' testimony breached the confrontation clause. We, nonetheless, find the error harmless and affirm the conviction. We do not address the assignment of error stemming from the toxicology laboratory's use of an expired vial because Christopher Dodson did not seek to exclude evidence at trial on this basis.

FACTS

The prosecution of Christopher Dodson arises from the death of his girlfriend, Carrie Martin, from an automobile accident. The State alleged that Dodson drove the car, in which Martin rode as a passenger. Because of Dodson's right to remain silent, we know little about events leading to the dreadful accident. Some evidence suggests that both Carrie Martin and Dodson consumed methamphetamine and cannabis in the days

and hours before Martin's demise.

We begin the story with testimony of those who approached the scene of the accident after the tragedy. On March 6, 2021, at 3 a.m., William Sexton drove on Government Way in Spokane County to begin his job as a truck driver. His wife Molly accompanied him. The couple noticed a vehicle off the road and a man flagging them down. William Sexton stopped his vehicle. The flagger, later identified as Christopher Dodson, told the Sextons that he had walked along the road, saw the vehicle off the road, and he noticed a female inside the vehicle. William Sexton examined the female passenger. She had suffered a head injury, was unconscious, and lacked a pulse. Molly Sexton called 9-1-1. The passenger was Carrie Martin. Dodson commented to the Sextons that the couple "seem to have this [situation] under control." Rep. of Proc. (RP) at 441. Dodson announced he would leave the scene and allow the Sextons to care for the predicament.

Law enforcement arrived on the scene before Christopher Dodson sauntered away. Officers noticed Dodson's vehicle was severely damaged, and one officer administered CPR on Carrie Martin. Another officer approached Dodson, who declared that the driver of the wrecked vehicle had jumped out of the car and exited the scene. Dodson, however, later admitted he drove the automobile. Dodson initially told law enforcement that a deer scampered across the road, and he swerved to avoid the animal. According to Dodson,

3

after he veered from the animal, his car struck a utility pole and a tree.

A later investigation at the accident scene revealed that Christopher Dodson did not apply the car brakes. Tire impressions showed no sliding, skidding, or digging.

Other individuals gathered at the accident site. At trial, these witnesses testified that Christopher Dodson exhibited slurred speech, droopy eyes, anxiety, and restlessness that early morning. Dodson kept moving and repeatedly placed his hands in and out of his sweatshirt pockets. One witness averred that Dodson smelled like alcohol, but another witness avowed she did not smell alcohol.

Carrie Martin died at the location of the car accident. Blood testing revealed that Martin's blood contained methamphetamine, amphetamine, and gabapentin at the time of her death. Nevertheless, authorities ruled the cause of death to be blunt-force injuries from the accident.

Law enforcement transported Christopher Dodson from the accident situs to Spokane County jail, where officers obtained a warrant to draw a sample of his blood. On March 11, 2021, the Washington State Patrol Toxicology Laboratory received, from law enforcement, two vials of Dodson's blood for testing. We refer to the vials as vial A and vial B.

The Washington State Patrol Toxicology Laboratory has suffered contamination in its laboratory environs. Brian Capron, a supervisor at the toxicology laboratory, testified,

4

at a motion to dismiss hearing, about the contamination history. According to Capron, the toxicology laboratory utilized a portion of the annex of the Washington State Patrol's Crime Laboratory, a separate unit of the State Patrol. Four toxicology laboratory scientists reviewed data at desks in the annex. The same scientists also performed chemical extractions under a hood inside the annex. In October 2018, a test result in the annex showed the presence of methamphetamine in a blood vial, whereas an earlier screening of the same sample showed no presence. The laboratory performs an initial screening to save money if that screening shows no suspected substance. If the screening demonstrates a presence of a substance, the laboratory performs the more expensive test that quantifies the amount of the controlled substance. In June 2019, additional testing also showed discrepancies with regard to the presence of methamphetamine. The laboratory ceased using the annex in June 2019. The laboratory's accreditation, however, never lapsed.

Laboratory contamination extended beyond the Washington State Patrol Criminal Laboratory annex and to Hood 1 in the toxicology laboratory's main area. The toxicology laboratory ceased operations at Hood 1 for a time.

In 2020, the toxicology laboratory contracted with BioClean to scrub the contamination from the annex. Because of the extent of the contamination, BioClean cleaned at least twice. As of trial, an outside organization quarterly still tested the

5

laboratory for contamination.

On May 4, 5, 7, and 25 and June 3, 2021, the Washington State Patrol Toxicology Laboratory tested vial A, which revealed a methamphetamine level of 0.63 milligrams per liter. This first vial's blood carried a THC concentration of 3.3 nanograms per milliliter. Andrew Gingras performed the test for methamphetamine in vial A. Kelly Daniel performed the THC testing in the vial.

In May 2021, the toxicology laboratory continued to investigate ongoing methamphetamine contamination. The testing for contamination continues today.

On May 26, 2022, the Washington State Patrol Toxicology Laboratory Lab tested vial B, which revealed 0.049 milligrams per liter of amphetamine and 0.59 milligrams per liter of methamphetamine. The testing result for THC in vial B echoed the result from vial A. Kelly Daniel performed the testing for both the methamphetamine and THC. Vial B's expiration date was November 30, 2021, more than five months before the toxicology laboratory tested its contents. Andrew Gingras opined at trial that the results of vial A confirmed the accuracy of the results of vial B and vice versa.

With his motion to dismiss, Christopher Dodson filed a declaration by a representative of Becton Dickinson (BD) in response to a subpoena. BD manufactures the vials utilized by the Washington State Patrol Toxicology Laboratory. The declaration proclaimed that BD guarantees its vials to accurately determine blood content up to the

date of expiration. The company, however, will not warrant the efficacy of a vial after the expiration date.

Brian Capron, who testified about contamination at the toxicology laboratory, also testified about the use of expired blood vials in response to Christopher Dodson's motion to dismiss. Capron explained that a vial does not automatically fail after it passes its expiration date. He had not seen any data that indicated testing after the expiration date would create unreliable results. Dodson did not object to Capron's testimony regarding the expiration date of vials.

In this appeal, the State of Washington argues that its forensic scientists, including Kelly Daniel and Andrew Gingras, only place a vial of blood into a machine and push a button when testing a blood sample for foreign substances. One of the State's witnesses promoted this simplistic view of the work of the scientist. Brian Capron averred that "[y]ou place the vials on there, hit go, and the instrument does all the work." RP at 28. One might wonder if a trained, disinterested, and disinfected rhinoceros could then test blood samples. Regardless, contrary to the State's portrayal, evidence showed a protracted process for testing blood at the Washington State Patrol Toxicology Laboratory. Washington State Patrol Toxicology Laboratory rules required that Kelly Daniel exactingly follow protocol when administering the tests for Christopher Dodson's blood in vials A and B. The protocol employs procedures commonly accepted in the

scientific community.

The toxicology laboratory protocol demanded examination of Christopher Dodson's blood vials to confirm his blood lay inside. This examination of the label extended to comparing its content with the police request for an analysis. Daniel next, according to protocol, needed to transfer Dodson's blood, with a dropper called a pipette, into new vials. Use of the pipette enables the scientist to place the appropriate level of blood into the new vials. Next, the protocol required the addition of solvent chemicals to the blood to produce a concentrated extract for testing. If Daniel carelessly performed one of these tasks, she risked contaminating the blood.

Toxicology laboratory protocol demanded that scientist Kelly Daniel use multiple controls to test for machine error and contamination in order to prevent inaccurate blood readings. Protocol required a blank sample to ensure no contamination. A blank sample contains no substances and should generate no positive result for drugs. Protocol also commanded that Daniel run a "negative control" or "internal standard," a sample that mimics the drug being tested. RP at 693-94. Finally, the laboratory standards insisted on a "positive control" containing a known quantity of the drug being tested to confirm the machine was properly calibrated. RP at 694.

After purportedly performing the series in the protocol, Kelly Daniel collected initial measurements and results, known as raw data, that had yet to be interpreted.

8

Daniel then prepared three pages of typed and handwritten notes, for each of the two vials of Christopher Dodson's blood, which included the raw data. As part of preparing the notes, the toxicology laboratory protocol required Daniel to confirm calibrators and controls being within acceptable range. Protocol then demanded peer review by another person of Daniel's testing and notes.

Kelly Daniel's notes for vial A cover both THC and methamphetamine testing. The notes for vial B cover only methamphetamine testing. The typed and handwritten notes detailed the blank tests, working standards, controls, pipettes, and variables used by Daniel. She signed and dated those notes.

At trial, Andrew Gingras testified that he reviewed Kelly Daniel's paperwork. Based on the paperwork, Gingras opined that Christopher Dodson's blood samples contained narcotics. Gingras authored the reports on the quantity of THC and methamphetamine in Dodson's system based on the data produced at least in part by Daniel's testing. Gingras also based his quantifications on information found in Daniel's notes about whether "positive controls" met the accepted criteria and about machine calibration.

Andrew Gingras conducted the testing of the methamphetamine in the blood found in vial A. Christopher Dodson does not challenge the results of that testing based on the confrontation clause.

At trial, Andrew Gingras testified to the interaction of methamphetamine and THC. According to Gingras, the combination of both drugs alters the physiology to a greater extent than the sum of each drug operating separately.

At trial, Spokane County Sheriff's Office Detective Jeffrey Welton testified that Christopher Dodson, in a jail phone call, commented: "I know what's in [Martin's] blood. I know what prescriptions she takes. We were both doing the same thing." RP at 661. Dodson added that he and Martin had used methamphetamine "up until the event for the last couple of days, that he wasn't doing a whole lot of it but had only taken about two or three hits a day." RP at 662. During the call, Dodson admitted he drove the car at the time of the collision.

PROCEDURE

On March 9, 2021, the State of Washington charged Christopher Dodson with vehicular homicide for killing Carrie Martin while operating a motor vehicle. The State alleged Dodson committed the crime by any one of three alternative means: by driving while under the intoxicating influence of a drug, by driving in a reckless manner, or by driving with disregard for the safety of others.

Christopher Dodson moved the trial court to dismiss the charge of vehicular homicide pursuant to CrR 8.3 and *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Dodson argued: (1) methamphetamine contamination at the

10

Washington State Patrol Toxicology Laboratory's annex occurred, resulting in governmental mismanagement; (2) the prosecution failed to preserve exculpatory evidence in violation of *Brady* by opening vial B and testing its blood contents in a potentially contaminated facility; (3) the prosecution failed to preserve exculpatory evidence in violation of *Brady* when testing the contents of vial B after the vial's expiration date; and (4) the State failed to make relevant disclosure of defects in the tubes used to store Dodson's blood.

Christopher Dodson, in his motion to dismiss, did not argue that use of the expired vial B violated the terms of RCW 46.61.506(3), which precludes the admission of blood-test evidence unless testing was "performed according to methods approved by the state toxicologist." Nor did Dodson contend that use of an expired vial failed to conform to any theory or principle that has achieved general acceptance in the relevant scientific community as demanded by *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923).

In response to Christopher Dodson's motion to dismiss, the State argued that Dodson could not show prejudice that impacted his right to a fair a trial. The State asserted that remedial action taken by the Washington State Patrol Toxicology Laboratory after the contamination and its current redundancy process showed the current reliability of the laboratory. The State added that the contamination occurred in the

11

laboratory's annex, which closed in 2019, years before the testing of vials A and B. The State contended that the results of the methamphetamine level being the same in both vials defeated Dodson's claim that the State failed to preserve material exculpatory evidence. Finally, the State argued it disclosed defects in tubes because it posted the manufacturer's recall notice on the Washington State Patrol website.

The superior court conducted a hearing on Christopher Dodson's motion to dismiss. Brian Capron, a supervisor at the toxicology laboratory, and Amanda Black, the laboratory's quality assurance manager, testified at the hearing. Capron did not participate in the testing of Dodson's blood. We previously narrated some of Capron's testimony.

The trial court denied Christopher Dodson's motion to dismiss. According to the court, Dodson could challenge the reliability of the toxicology laboratory results, but he had failed to meet the high burden for the extraordinary remedy of dismissal under CrR 8.3 or a lesser burden to suppress evidence. According to the trial court, the laboratory had taken appropriate measures to clean the contaminated area of the laboratory. According to the court, evidence attended to the vials did not exculpate Dodson such that the State did not need to disclose information surrounding the vials. The recall notice emphasized by Dodson concerned methanol, while the laboratory tested Dodson's blood for drugs. Also, the laboratory posted the recall notice on its website.

During trial, Christopher Dodson filed a motion to limit Andrew Gingras' testimony to statements about methamphetamine in blood vial B. Conversely, Dodson sought to preclude Gingras from testifying about test results for THC in vial A and methamphetamine in vial B. Dodson argued that the toxicology results inculpated him. Thus, the confrontation clause demanded that Kelly Daniel, the forensic scientist who performed the toxicology analysis for THC in vial A and methamphetamine in vial B, confront him such he might cross-examine her. According to Dodson, the confrontation clause disabled Gingras from testifying about the process Dodson's blood underwent, data generated from the blood samples, or discretionary decisions Daniel made while conducting her analysis.

The superior court entertained testimony from Andrew Gingras in response to Christopher Dodson's motion to eliminate much of Gingras' testimony. We have already outlined most of that testimony. In addition, however, Gingras insisted that he reviewed and performed an independent analysis of the blood data generated by Kelly Daniel. He did not detail what that review entailed. Gingras admitted he played no role in producing the data.

In its oral ruling, the trial court mentioned the confusing and unstable nature and the tortured history of the law meshing blood testing and the confrontation clause. The court denied Dodson's motion.

Kelly Daniel never testified at trial.

Christopher Dodson's expert, Ken Meneely, testified about Christopher Dodson's blood results. Meneely labeled the testing of the contents of vial A as a "failure" because of contamination in the toxicology laboratory that caused corruption of the vial and its contents. Meneely rejected the results of testing of the blood in vial B because the laboratory violated its own protocol when failing to perform two independent tests.

The trial court instructed the jury on the three means by which it might convict Christopher Dodson of the crime of vehicular homicide. Therefore, the State did not necessarily need to prove that methamphetamine or THC impaired Christopher Dodson's driving at the time of the fatal accident. Two of the means did not require a controlled substance in the blood.

During closing argument, the State devoted substantial time to convincing the jury of Christopher Dodson's driving impairment. After arguing at length about Dodson's impairment, the State mentioned alternative grounds for proving vehicular homicide. But then the State inserted driving impairment as a factor in showing the alternative means. The State insisted that Dodson acted rashly, heedlessly, or with indifference to the consequences because he drove while knowing he had consumed methamphetamine and smoked cannabis. According to the State, Dodson also acted with disregard to the safety of Carrie Martin because he drove "with a whole spattering of chemicals in [his]

14

system that [were] clearly affecting [him]." RP at 844. The State throughout its closing argument emphasized the blood test results to demonstrate Dodson's driving while impaired by chemicals.

The jury found Christopher Dodson guilty of vehicular homicide. The jury did not decide in the verdict under which alternative means Dodson committed the crime. The superior court sentenced Dodson to 90 months imprisonment and ordered him to pay a $500 victim penalty assessment.

## LAW AND ANALYSIS

On appeal, Christopher Dodson argues the State violated his constitutional right to confront witnesses against him when the trial court permitted Andrew Gingras to testify to blood test results created by the work of Kelly Daniel. Dodson also contends the trial court erred when it allowed the jury to hear about test results from blood that came from a vial whose life span had ended. Finally, Dodson maintains the trial court erred when imposing a victim penalty assessment because of his indigency. Assuming we agree with Dodson on one of his first two assignments of error, we must determine whether the error was harmless. If harmful, we would reverse Dodson's conviction.

### Confrontation Clause

On appeal, Christopher Dodson argues that the testimony of Andrew Gingras violated his rights under the confrontation clauses of both the United States and the

15

Washington State Constitutions.  According to Dodson, Gingras served as a surrogate witness for toxicologist Kelly Daniel, who incriminated him through her testing of his blood and her notation of the results of the testing.  Gingras did not conduct the testing of the THC found in vial A or the THC and methamphetamine found in Vial B.  Dodson complains that, because the person who tested the THC in vial A and both substances in vial B did not appear at trial, he could not effectively challenge, by cross-examination, the validity of the blood test results.

In response, the State downplays any independent judgment exercised by Kelly Daniel when performing her testing.  The State claims that Andrew Gingras, when testifying to the quantity of the THC and methamphetamine found in the blood, obtained the numbers from a machine, not from Kelly Daniel.  Therefore, Andrew Gingras' testimony did not form hearsay and did not violate the confrontation clause.

The United States Constitution states that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI.  The Washington State Constitution provides the accused the right "to meet the witnesses against him face to face."  CONST. art. I, § 22.  Washington courts refer to these equivalent provisions collectively as the confrontation clause.  The Washington State Supreme Court applies the state constitution's clause consistent with the reading of the federal confrontation clause.  *State v. Lui*, 179 Wn.2d 457, 469, 315

16

P.3d 493 (2014), *abrogated on other grounds, State v. Hall-Haught*, 4 Wn.3d 810, 569

P.3d 315 (2025).  This court reviews de novo an alleged violation of the confrontation

clause.  *State v. Hall-Haught*, 4 Wn.3d 810, 816 (2025).

The confrontation clause vindicates the right of cross-examination.  *State v.*

*Foster*, 135 Wn.2d 441, 456, 957 P.2d 712 (1998).  According to the United States

Supreme Court, the confrontation clause ensures the reliability of evidence against a

criminal defendant by subjecting the evidence to rigorous testing in the context of an

adversary proceeding before the trier of fact.  *Maryland v. Craig*, 497 U.S. 836, 845,

110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990).

The confrontation clause's prohibition applies only to testimonial hearsay.  *Smith*

*v. Arizona*, 602 U.S. 779, 784, 144 S. Ct. 1785, 219 L. Ed. 2d 420 (2024).  Thus, two

predicates apply to the confrontation clause.  First, the challenged testimony must be

testimonial.  Second, the testimony must be hearsay.  Sometimes the courts conflate the

two concepts without knowing it is doing so.  We address each requirement separately.

We then address whether the error in admitting the testimony of Andrew Gingras was

harmless.

*Issue 1: Was the testimony of Andrew Gingras as to the level of THC and*

*methamphetamine in vial B and the level of THC in vial A testimonial?*

*Answer 2: Yes.*

17

We do not value the cavalier attitude to which the State, in this appeal, has approached the question of whether Andrew Gingras' testimony was testimonial. In its opening brief, the State once, if not twice, conceded the challenged testimony is testimonial. On page 39 of the brief, the State wrote: "Although the statements at issue were testimonial, they were not hearsay. . . ." On page 57 of the brief, the State wrote that the blood test results arguably were testimonial because of being created for an evidentiary purpose. But the State informed the court it need not address the testimonial nature of the blood test results because the evidence was not hearsay. Then in a statement of additional authorities, the State first suggested the record may not be sufficient to adjudicate the question of the testimonial nature of the challenged testimony.

Taken literally, the confrontation clause should preclude the State from introducing any person's testimony through the testimony of another. Every person's testimony should be under oath and cross-examined, not entered through a spokesperson without firsthand knowledge of the content of the testimony. *Maryland v. Craig*, 497 U.S. 836, 851 (1990). Christopher Dodson claims that Andrew Gingras bespoke the testimony of Kelly Daniel when Gingras told the jury the results of tests performed by Daniel. He complains that Daniel never underwent the witness oath. Nevertheless, perhaps perverting the term "testimony," a testifying witness may repeat for the jury out-of-court statements of someone else as long as confrontation clause jurisprudence does

not deem the statements "testimonial" in nature.

In *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the Supreme Court considered the admissibility of an out-of-court recorded statement by a third person, which implicated Michael Crawford, and held that the confrontation clause barred its admission because the statement was "testimonial." Based on a reading of the confrontation clause text and the history behind the clause, the Court reasoned that the confrontation clause applies to "witnesses" against the accused, that is those who "bear testimony." 541 U.S. 36, 51 (2004). Thus, the Supreme Court concluded that the confrontation clause was primarily concerned with testimonial statements. Statements become testimonial if made for the primary purpose of establishing or proving past events potentially relevant to a later criminal prosecution. *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). Even hearsay with an applicable exception becomes inadmissible in violation of the clause if it is testimonial hearsay. *Davis v. Washington*, 547 U.S. 813, 823 (2006).

*Crawford v. Washington* and *Davis v. Washington* advise generally how to assess a statement as testimonial. Statements made under circumstances that would lead an objective person to reasonably believe the statement would be available for use at a later trial are testimonial. *State v. Hall-Haught*, 4 Wn.3d 810, 819 (2025). When the out-of-court declaration passes as a casual statement made to a friend, it is nontestimonial.

19

*Crawford v. Washington*, 541 U.S. 36, 51 (2004).

The United States Supreme Court has held that testimonial certificates of the results of forensic analysis are created under circumstances that would lead an objective witness reasonably to believe the results would be available for use at a later trial. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009). Kelly Daniel performed her tests and reached her results for the sole purpose of presenting the information in court.

Even if a witness imparts facts to the court, the witness is not a witness for purposes of the confrontation clause unless those facts inculpate the defendant. *State v. Lui*, 179 Wn.2d 457, 480-81, 315 P.3d 493 (2014), *abrogated on other grounds by State v. Hall-Haught*, 4 Wn.3d 810, 569 P.3d 315 (2025); *City of Seattle v. Wiggins*, 23 Wn. App. 2d 401, 410, 515 P.3d 1029 (2022). The State impliedly concedes that the blood test results incriminate Christopher Dodson. The State rested its quest for a guilty verdict on the blood tests' recording of palpable amounts of THC and methamphetamine.

*Issue 2: Is the data created by Kelly Daniel hearsay when testified to by Andrew Gingras?*

*Answer 2: Yes.*

Christopher Dodson's appeal concerns statements made by a scientist during chemical testing, some of which statements the scientist placed in notes. Courts,

including the United States Supreme Court and the Washington Supreme Court, have struggled to apply the confrontation clause to the common situation when one scientist testifies to test results from a test conducted by another scientist. This struggle has engendered the question of whether the testing scientist's work and notes constitute hearsay. Typically, the testifying scientist reviewed the test results or functioned as the supervisor of the testing scientist.

A decade ago, testifying expert witnesses could rely on technical data prepared by others when reaching their own conclusions without requiring each laboratory technician to take the witness stand. *State v. Lui*, 179 Wn.2d 457, 483, 315 P.3d 493 (2014). This rule echoed ER 703, which allows an expert to rely on information, on which experts typically rely, even if the information would not otherwise be admissible at trial. The confrontation clause scope did not sweep in analysts whose only role was to operate a machine or add a reagent to a mixture. *State v. Lui*, 179 Wn.2d 457, 480 (2014). In *Smith v. Arizona*, 602 U.S. 779, 144 S. Ct. 1785, 219 L. Ed. 2d 420 (2024), the nation's high Court shifted its analysis in this setting, which, in turn, caused a shift in this state high court's analysis. In fairness to Christopher Dodson's trial court, the respective courts issued their decisions after Dodson's trial.

As the law stands now, the confrontation clause's bar of testimonial statements of an absent witness applies in full to forensic evidence. *Smith v. Arizona*, 602 U.S. 779,

21

783, 144 S. Ct. 1785, 219 L. Ed. 2d 420 (2024). Thus, a prosecutor cannot introduce an absent laboratory analyst's testimonial out-of-court statements to prove the results of forensic testing. *Smith v. Arizona*, 602 U.S. 779, 783 (2024); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 307, 329, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009). The prohibition operates when an expert relays an absent lab analyst's statement as part of offering his opinion. *Smith v. Arizona*, 602 U.S. 779, 783 (2024). A State may not introduce one lab analyst's written findings through the testimony of another. *Bullcoming v. New Mexico*, 564 U.S. 647, 651-52, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011). The State's use of a substitute or surrogate expert, who did not participate in any relevant scientific testing, violates the accused's confrontation clause rights and requires reversal. *Smith v. Arizona*, 602 U.S. 779, 144 S. Ct. 1785, 219 L. Ed. 2d 420 (2024).

The confrontation clause bars one scientist from testifying to the results of another scientist's work because the surrogate witness lacks percipient knowledge of what the certifying analyst comprehended or observed about the particular test and testing process. *Bullcoming v. New Mexico*, 564 U.S. 647, 661 (2011). Also, lab tests remain subject to the risk of manipulation or mistake. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 318 (2009). When the State elects to introduce the certification of test results, its author—and not any substitute—becomes the witness that the defendant has the right to confront. *Smith v. Arizona*, 602 U.S. 779, 786 (2024). The jury cannot decide whether the

surrogate expert's opinion is credible without evaluating the truth of the factual assertions on which it is based. *Smith v. Arizona*, 602 U.S. 779, 796 (2024).

An initial review of the principles emanating from *Smith v. Arizona*, 602 U.S. 779 (2024), suggest that the trial court erred when allowing Andrew Gingras to testify to the measurements of the THC levels in blood vials A and B and the methamphetamine level in blood vial B. The State, nonetheless, implores the court to reject the application of the *Smith* rules to Christopher Dodson's prosecution because of distinguishing facts. The State also insists that the facts in the Washington Supreme Court's recent decision of *State v. Hall-Haught*, 4 Wn.3d 810 (2025), which follows *Smith v. Arizona*, materially diverge. Thus, we dissect the facts in both *Smith* and *Hall-Haught* as well as this court's decision in *City of Seattle v. Wiggins*, 23 Wn. App. 2d 401, 515 P.3d 1029 (2022).

Before *Smith v. Arizona*, this court resolved *City of Seattle v. Wiggins*, 23 Wn. App. 2d 401 (2022). This court held that the testing toxicologist, Christie Mitchell-Mata, rather than the reviewing analyst, Brian Capron, was the necessary witness against Roosevelt Wiggins because the toxicologist actually performed the blood test that created the incriminating evidence against Wiggins. The blood alcohol content number found by the toxicologist inculpated Wiggins. Mitchell-Mata's work included handling, preparing, and testing the samples; interpreting the data in real time; and running additional testing as necessary. After completing the testing and initial review process, Mitchell-Mata

23

prepared a final report of her results and conclusions. Brian Capron signed the final report as the "reviewer." Because the State presented only the reviewing analyst to testify at trial and the analyst was not the "witness against" Wiggins, the court reversed Wiggins' conviction. Wiggins could not cross-examine the person who made discretionary decisions during the testing process. This court noted the numerous subjective and human factors that exist when testing that the testifying analyst did not personally observe and could not discuss or defend.

In Christopher Dodson's prosecution, Andrew Gingras reviewed Kelly Daniel's notes for methamphetamine and THC in vial B and her notes for the THC for vial A without any participation in the testing. Gingras relied on those notes when testifying to the accuracy of the measurement of the THC and methamphetamine levels in Dodson's blood. As in *City of Seattle v. Wiggins*, the laboratory test results inculpated Dodson.

The State of Washington emphasizes that Kelly Daniel never prepared a report, while Christie Mitchell-Mata, the toxicologist conducting the test, prepared the report for Roosevelt Wiggins' blood test. Andrew Gingras, the reviewing analyst, unlike Brian Capron, the reviewing analyst in *City of Seattle v. Wiggins*, prepared the only report. Thus, the State considers the author of the report and only the author to be the witness against the accused who the law permits or needs to testify. This court, in *City of Seattle v. Wiggins*, never focused on the author of the report, however. The court focused on the

24

person conducting the test and the need to cross-examine the testing process.  The United States Supreme Court, in *Smith v. Arizona*, and the Washington Supreme Court, in *State v. Hall-Haught*, also concentrated on the confrontation clause's demand that the accused cross-examine the person who performed the test leading to the inculpatory toxicology measurements.

Two years ago, the United States Supreme Court decided *Smith v. Arizona*, 602 U.S. 779 (2024).  The State of Arizona convicted Jason Smith of drug offenses.  The state crime lab tested drugs seized from Smith.  Lab analyst Elizabeth Rast performed the testing, generated typed notes, and prepared a signed report documenting her results.  The report, in addition to outlining the procedures she followed, included Rast's conclusion that the items were methamphetamine and cannabis.  Rast did not testify at trial.  Instead, the State called Greggory Longoni, a forensic scientist with no prior connection to Smith's case to provide a purported independent opinion on the drug testing performed by Rast.  The Supreme Court held that the confrontation clause's prohibition on testimonial statements admitted at trial applies in full to forensic evidence.  The Court also rejected the view that, when an expert recites another analyst's statements as the basis of his opinion, the confrontation right is not implicated.  The Court emphasized that the State admitted the test results for their truth.  The State may not introduce the test results through a surrogate analyst who did not participate in their creation, even if the

25

surrogate analyst presents the out-of-court statements as the basis for his own expert opinion.

In *Smith v. Arizona*, 602 U.S. 779 (2024), the United States Supreme Court wrote that the State of Arizona impliedly argued that every testimonial lab report could come into evidence through any trained surrogate, however remote from the case. Such a rule would arrogate an accused's right to cross-examine the testing analyst about what she did, how she did it, and whether her results should be trusted. Arizona's position amounted to an end run around the confrontation clause.

The Washington Supreme Court, in *State v. Hall-Haught*, 3 Wn.3d 810, 569 P.3d 315 (2025), revisited the issue of whether the State breaches the confrontation clause when it admits forensic test results into evidence without testimony from the lab analyst who conducted the testing. Based on *Smith v. Arizona*, the court answered: yes. The court noted that *Smith* abrogated in part its decision in *State v. Lui*.

Samantha Hall-Haught's car collided head-on with Kyra Hall's vehicle. The impact popped Hall-Haught's car's trunk open. Drug paraphernalia spewed onto the road. A law enforcement officer, armed with a search warrant, drew blood from Hall-Haught, who reposed in the hospital. Hall-Haught's lab results showed 1.5±0.40 nanograms per milliliter of THC in her blood. The State charged Hall-Haught with vehicular assault under RCW 46.61.502.

At Samantha Hall-Haught's jury trial, the State called Katie Harris, a supervisor with the Washington State Patrol Toxicology Laboratory, who testified that she did not test the blood samples, but reviewed and signed the lab report of Hall-Haught's blood samples testing. Forensic analyst Mindy Krantz performed the toxicology examination and produced the report on Hall-Haught's blood samples. Hall-Haught objected to Harris' testimony. Hall-Haught argued that introducing the test results without the testimony of Krantz violated her right to confront and cross-examine a witness against her. The trial court admitted the lab test results. The trial court followed the Washington Supreme Court's former ruling, in *State v. Lui*, that an expert witness could testify to her own conclusions even when relying on data prepared by a nontestifying technician.

On appeal, the State contended that Katie Harris testified to her independent conclusion and therefore her testimony did not violate the confrontation clause. Additionally, the State asserted that Harris' independent opinion was not hearsay because the opinion did not convey another analyst's out-of-court statements. Instead, Harris supervised Mindy Krantz's work from the start of the case and also reviewed the sample testing before approving the release of the test results.

The Washington Supreme Court reversed Samatha Hall-Haught's conviction because of the violation of the confrontation clause. During her trial testimony, Harris referred to the toxicology test report. Harris relied on Krantz's test results and Krantz's

27

confirmation that she followed standard protocol during the testing.

The State argues that forensic scientist Kelly Daniel never formulated an opinion or analysis. But the State does not explain the relevance of the contention. The confrontation clause bars Andrew Gingras from testifying to the product of Daniel's work not because it may or may not result in the construction of an opinion by Daniel, but because Daniel, not Gingras, possesses the percipient knowledge of how she performed the testing.

The State emphasizes that Andrew Gingras reviewed Kelly Daniel's work before forming his own opinions. Yet, Katie Harris did the same with Mindy Krantz's work. Katie Harris also reviewed the sample testing before approving the release of the test results. Andrew Gingras may have even finalized some of the testing. Nevertheless, like Katie Harris, Andrew Gingras relied on Kelly Daniel's confirmation in her notes that she followed standard protocol during the testing. Gingras would not have testified to the blood test results without the confirmation from Daniel.

The State argues that the question of whether Kelly Daniel followed protocol when performing her testing goes to foundation or authenticity. We do not respond to this argument. Assuming Christopher Dodson could exclude the testing results reached by Kelly Daniel on foundational grounds, the law would not preclude him from asserting other grounds such as the confrontation clause.

28

Despite the teachings of *Smith v. Arizona* and *State v. Hall-Haught*, the State

continues to insist that the methamphetamine and THC data was not hearsay by

employing evidence rules and decisions outside the context of the confrontation clause.

According to the State, the liquid chromatography/mass spectrometry machine, not Kelly

Daniel, generated the raw data. The State cites numerous foreign decisions for the

proposition that a litigant may introduce at trial information automatically produced by a

machine without the constraints of the hearsay rule. The State contends that only

statements uttered by someone outside the court or information created by a person other

than the witness falls within the confines of the hearsay rule. ER 801(a) defines a

"statement" as "(1) an oral or written assertion or (2) nonverbal conduct of a *person*, if it

is intended by the *person* as an assertion." (Emphasis added.)

The State too narrowly regurgitates the contentions asserted by Christopher

Dodson. Dodson does not only complain about Andrew Gingras testifying about the

THC and methamphetamine levels discerned from the work performed by Kelly Daniel.

Dodson complains that, for Gingras to opine to an accurate end result, Gingras must

assume that Daniel engaged in no fraud or mistakes during the process she undertook.

Dodson complains that the trial court allowed the State's witness to testify to the end

result being correct without his being able to cross-examine the person primarily

responsible for the accuracy of the journey to the end. Dodson murmurs that Gingras

29

relied on Daniel's representations that she silently uttered when performing her work accordance to protocol. Dodson was unable to question Daniel. The United States Supreme Court in *Smith v. Arizona* particularly called foul to the practice of the State sheltering the analyst from cross-examination by calling as a trial witness another scientist who later reviewed the work of the analyst.

The foreign decisions, on which the State relies, all concern the automatic response of a machine to an external stimulus, when this response cannot be manipulated by a human being. For example, in *State v. Ziegler*, 855 N.W.2d 551 (Minn. Ct. App. 2014), the Minnesota court ruled that the State's introduction of data from a car's sensing and diagnostic module (SDM) did not violate the confrontation clause. Contrary to the State of Washington's suggestion, *Ziegler* did not implicate the hearsay rule. The module was a type of "event data recorder" that collected and recorded information such as vehicle speed, engine speed, and brake-switch activation. No one could finesse the data recorded.

The Minnesota court, in *State v. Ziegler*, distinguished its circumstances from the circumstances when a human person performs a test or analysis. The Minnesota courts had consistently ruled a laboratory technician's report to be testimonial such that the State needed to call that technician to testify at trial rather than someone else connected to the laboratory.

In its legal analysis, the State characterizes Kelly Daniel's task as merely loading vials into the machine and "hitting go." In our statement of facts, we delineated the extensive tasks that Daniel performed that renders the State's characterization fictitious. For example, in her notes, Kelly Daniel wrote about pipettes, solvents, and control samples she used to protect against miscalibration and contamination. Her signature at the bottom of the notes testified that she employed the pipettes, solvents, and controls in her testing. Gingras reached his opinion as to the amount of methamphetamine and THC in Dodson's blood in part on these statements of Daniel.

Cross-examining Kelly Daniel loomed important to Christopher Dodson for other reasons. Dodson wanted to question Daniel as to whether she noticed that vial B had expired when she performed the testing. The answer to that question could have prompted other important questions. Dodson wanted to ask whether the vial or the rubber cap had degraded due to its expiration. Dodson wanted to inquire whether the expired vial contained the required anticoagulants and enzyme poisons.

*Issue 3: Was the violation of Andrew Gingras right to confrontation harmless?*

*Answer 3: Yes.*

The State asks us to affirm Christopher Dodson's conviction regardless of a confrontation clause violation on the basis of harmless error. We do so.

An error in a trial does not merit reversal unless the error prejudiced the defendant.

31

*State v. Grenning*, 169 Wn.2d 47, 57, 234 P.3d 169 (2010); *State v. Cunningham*, 93

Wn.2d 823, 831, 613 P.2d 1139 (1980). Confrontation clause errors are subject to a

harmless-error analysis. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431,

89 L. Ed. 2d 674 (1986); *State v. Wilcoxon*, 185 Wn.2d 324, 335-36, 373 P.3d 224

(2016).

The test of harmless error differs depending on whether the error was

constitutional or nonconstitutional in nature. Christopher Dodson suffered constitutional

error. With a constitutional error, this court presumes prejudice. *State v. Anderson*, 19

Wn. App. 2d 556, 564, 497 P.3d 880 (2021). We then apply the harmless beyond a

reasonable doubt standard. *State v. Nist*, 77 Wn.2d 227, 234, 461 P.2d 322 (1969). We

place this heavy burden on the State to deter conduct that undermines the principle of

equal justice. *State v. Jackson*, 195 Wn.2d 841, 856, 467 P.3d 97 (2020).

One month ago, the Washington Supreme Court clarified the state's constitutional

harmless error test in *State v. Magana-Arevalo*, No. 103586-1 (Wash. Jan. 15, 2026),

https://www.courts.wa.gov/opinions/pdf/1035861.pdf. On that same day, the Supreme

Court applied the same test in *State v. Wasuge*, No. 103530-6 (Wash. Jan. 15, 2026),

https://www.courts.wa.gov/opinions/pdf/1035306.pdf. One might wonder if Washington

courts should utilize the constitutional harmless error test employed by the United States

Supreme Court when trial error consists of a violation of the federal Constitution,

including the confrontation clause. Indeed, United States Supreme Court precedent established minimum requirements state courts must follow in evaluating constitutional error. *Chapman v. California*, 386 U.S. 18, 20-21, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). A state, however, remains free to afford greater protections to its citizens than required by *Chapman* and classify fewer such violations as harmless. *Connecticut v. Johnson*, 460 U.S. 73, 81, 103 S. Ct. 969, 74 L. Ed. 2d 823 (1983) (plurality opinion); *Commonwealth v. Story*, 476 Pa. 391, 405-06, 383 A.2d 155 (1978). The Washington Supreme Court deems this state's constitutional harmless error test consistent with the federal test. *State v. Magana-Arevalo*, slip op. at 36.

In *State v. Magana-Arevalo*, the Washington high court noted that it has used different language to describe the test for deciding constitutional harmless error. The court stated that some litigants, including Cristian Magana-Arevalo, have asserted that the court promotes two separate and inconsistent tests. One iteration of the harmless error rule has demanded that the State prove beyond a reasonable doubt that the jury verdict did not rely on the error, known as the contribution test. *State v. Lui*, 179 Wn.2d 457, 495 (2014), *abrogated on other grounds by State v. Hall-Haught*, 4 Wn.3d 810 (2025). Another replication has employed what was known as the overwhelming untainted evidence test and looked to the untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt. *State v. Anderson*, 171

Wn.2d 764, 770, 254 P.3d 815 (2011); *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985).

The court, in *State v. Magana-Arevalo*, insisted it has employed the same assessment in practice by combining the two tests. The court, nonetheless, clarified the test. Under the proper analysis, the reviewing court must consider whether the State has carried its burden of proving that a constitutional error, like the unconstitutional admission of evidence, is harmless beyond a reasonable doubt by considering *both* (1) the strength of the properly admitted evidence of guilt *as well as* (2) the inculpatory or prejudicial impact of the unconstitutionally admitted evidence on even the properly admitted evidence. The court must then ask whether, considering both the properly admitted evidence and the impact of the improperly admitted evidence, the State has proved the error was harmless beyond a reasonable doubt. Stated less verbosely, the reviewing court must ask whether the State has proved the error harmless beyond a reasonable doubt, considering both the strength of the properly admitted evidence of guilt and the prejudicial impact of the erroneously admitted evidence on even the properly admitted evidence.

A majority of this court's panel faults the harmless error doctrine for two reasons. First, a court in a jury trial should not be weighing evidence to determine the guilt of the accused. The harmless error doctrine turns this reviewing court into a super-jury or

factfinder of guilt. Second, the test of harmless error includes the concept of how a reasonable jury would vote if the trial had not been contaminated by error. But many accused are acquitted because one or more jurors consider the facts or law unreasonably. The harmless error doctrine removes this benefit from the accused.

Before channeling the *Magana-Arevalo* test, we review the assertions forwarded by the State and Christopher Dodson. The State contends that Christopher Dodson's appearance and behavior at the accident scene confirmed his having partaken in illicit substances such that evidence of Kelly Daniel's test results added little to the prosecution. Dodson's muscles appeared rigid and stiff. Dodson used rapid speech and did not remain still. His eyelids drooped.

Christopher Dodson meets the contention of the State by characterizing eyewitness testimony as imprecise evidence. Those who observed him did so in the darkness of 3:00 a.m. Dodson complains that the inadmissible toxicology evidence bolstered this inexact eyewitness evidence. Dodson adds that his erratic behavior at the scene of the crash conformed as much to the conduct of one involved in a fatal collision as one under the influence of drugs. According to Dodson, his behavior also understandably resulted from the presence of numerous law enforcement officers at the collision location and anxiety at being questioned by the officers.

The State highlights that Christopher Dodson admitted the use of methamphetamine and alcohol during a jail call. Therefore, according to the State, the jury would have convicted Dodson even without Daniel's testing. Dodson responds that his phone admission was vague. He confessed he had taken "two or three hits" of methamphetamine per day before the accident. RP at 662. He did not expressly concede the use of methamphetamine on March 5 or 6. Kelly Daniel's testing did not confirm alcohol in Dodson's blood. A responding officer smelled no alcohol on Dodson.

The State underscores that Christopher Dodson ignores his comment on the phone that his methamphetamine would be the same level as Carrie Martin's level. Dodson's remark confirms that he knew he was influenced while driving in the early morning hours.

The State argues that, because Andrew Gingras conducted the methamphetamine testing on Christopher Dodson's vial A, the jury could convict solely on those unchallenged methamphetamine results. The State notes that it did not need to prove Dodson under the influence of both methamphetamine and THC in order to demonstrate driving while impaired. The presence of either drug sufficed. Also, the State observes that it did not need to establish the presence of methamphetamine in both vial A and vial B. The presence of methamphetamine in either vial established Dodson's being under the influence. Christopher Dodson responds that the State ignores the strong evidence of

36

methamphetamine contamination lingering in the toxicology laboratory that could have corrupted vial A.

Christopher Dodson emphasizes a passage in the State's closing argument when the State's attorney remarked that the State had not demonstrated Dodson drove under the influence based only on one piece of evidence. "It's based off of the entirety of the evidence." RP at 840. The totality of the evidence included the toxicology reports.

Christopher Dodson notes that the State argued the amplifying effects of the use of THC and methamphetamine at the same time. If we agree with Dodson's confrontation clause challenge, we would strike all evidence of THC. Therefore, Dodson accentuates that the State could no longer pose its amplification of effects theory to the jury. The State does not respond.

The State emphasizes that it did not need to prove that Christopher Dodson drove under the influence of either THC or methamphetamine because it charged Dodson with vehicular homicide, an alternate means crime. RCW 46.61.520(1), the controlling statute, declares:

> (1) When the death of any person ensues within three years as a proximate result of injury proximately caused by the driving of any vehicle by any person, the driver is guilty of vehicular homicide if the driver was operating a motor vehicle:
> (a) While under the influence of intoxicating liquor or any drug, as defined by RCW 46.51.502; or
> (b) In a reckless manner; or

37

(c) With disregard for the safety of others.

Two of the other alternative manners in which the jury could have convicted Dodson required no evidence of impairment by drugs. The State impliedly suggests that all evidence of the use of cannabis and methamphetamine lacks relevance because of the alternative means. The State even insists that the jury convicted Christopher Dodson on all three alternative methods of committing the crime. The record is to the contrary. The jury entered a general verdict of guilt.

According to Christopher Dodson, the State's contention invites the question of why the State devoted inordinate effort in its criminal investigation and at trial to corroborate Dodson's driving under the influence. The State had no evidence of how Dodson operated the vehicle before the wreck. The State lacked evidence of how Dodson lost control of the car. During closing, the State led with its argument of impaired driving because of methamphetamine and THC and devoted significant time to discuss intoxication by drugs. More importantly, the State employed evidence of Dodson's methamphetamine and THC levels and his knowledge of his impairment when arguing that Dodson drove in a reckless manner and in disregard for the safety of others. The State conflated the alternative means of committing vehicular homicide.

The State highlights that reconstruction of the car wreck revealed that Christopher Dodson never swerved to avoid wildlife or attempted to navigate the curve in the road.

38

Instead, Dodson drove straight off the road without activating his breaks and crashed into a telephone pole and trees. According to the State, any reasonable jury would have returned the same verdict in the absence of any constitutional error.

After our extensive review of the parties' arguments on harmless error, we apply the new *Magana-Arevalo* formulation. We consider the properly admitted evidence of guilt to be compelling. We deem the prejudicial impact of the erroneously admitted evidence on the properly admitted evidence to be minimal. The State has shown the constitutional error to be harmless beyond a reasonable doubt. The theoretical reasonable jury would have convicted Dodson with the crime without the tainted evidence.

Admissible evidence included the methamphetamine test performed by Andrew Gingras. The testing revealed a methamphetamine level of 0.63 milligrams per liter. A jury would deem this evidence convincing of driving while under the influence of the drug. The tainted evidence did little to bolster the untainted evidence of Gingras' testing results. At trial, Christopher Dodson cleverly emphasized the methamphetamine contamination even outside the toxicology laboratory annex. But other evidence showed the laboratory had recently passed accreditation tests.

On appeal, Christopher Dodson shrewdly underscores the State's emphasis, at trial, of the mixture of THC with methamphetamine. Thus, according to Dodson, all of the evidence of THC should have been excluded. We still consider the argument weak to

a reasonable jury, who will be impressed with the one methamphetamine result.

The circumstantial evidence shows Christopher Dodson drove recklessly even if ignoring all drug testing results. The weather was fine. Dodson encountered no other traffic at the time of the accident. The road showed no skid marks or use of brakes. The car struck a tree and pole for no reason.

We doubt that a violent collision would cause someone to speak rapidly or quickly pace the road. Injury or dizziness from the crash would more likely render someone sluggish. One would also hope that Dodson would be concerned about his girlfriend and later remorseful for having killed her. He would not have given inconsistent statements to the officers. Christopher Dodson acted at the scene consistent with being intoxicated by methamphetamine.

Christopher Dodson conceded in a recorded phone call taking two hits per day of methamphetamine before the accident. Although he did not specify the particular days or time, the jury would conclude he had recently taken methamphetamine. On appeal, Dodson ignores his comments that his THC and methamphetamine level would be the same as Carrie Martin.

The jury had three alternative means, under which to convict Christopher Dodson of vehicular homicide. Even without the use of methamphetamine and THC, overwhelming circumstantial evidence established Dodson's driving in a reckless manner

40

and with disregard for the safety of others.

Expired Vial B

*Issue 4: Should this court entertain Christopher Dodson's assignment of error pertaining to admission of the blood tests from vial B when he did not move to exclude the evidence before the superior court?*

*Answer 4: No.*

On appeal, Christopher Dodson faults the trial court for failing to exclude test results from his blood contained in vial B. He argues that the expiration date of the vial rendered the test results unreliable. He relies on RCW 46.61.506(3), which excludes blood-test evidence unless testing was "performed according to methods approved by the state toxicologist." He also relies on *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923), while arguing that use of an expired vial did not conform to a theory or principle that has achieved general acceptance in the relevant scientific community.

Before the trial court, Christopher Dodson moved to dismiss the prosecution on the grounds of government misconduct and *Brady* violations. The misconduct included contamination at the Washington State Patrol Toxicology Laboratory and the *Brady* violations included failure to disclose a manufacturer's recall of tubes used to store blood. The motion did not seek a narrower remedy of exclusion of evidence of test results from vial B blood. He never mentioned RCW 46.61.506 nor *Frye v. United States*.

This court "may refuse to review any claim of error which was not raised in the trial court." RAP 2.5(a). Failure to object to the admissibility of evidence at trial precludes appellate review of that issue unless the alleged error is a manifest error affecting a constitutional right. *In re Detention of Taylor*, 132 Wn. App. 827, 836, 134 P.3d 254 (2006). Failure to lay an adequate foundation for a *Frye* challenge precludes appellate review. *In re Detention of Taylor*, 132 Wn. App. 827, 836 (2006).

Christopher Dodson admits that he did not reference *Frye* or statutory challenges in his pretrial motion. He claims his questions and argument at the motion to dismiss sufficiently preserved his challenge to the use of expired vials. We disagree. Dodson gave the State no notice such that it could prepare for a *Frye* hearing. Dodson afforded the trial court no opportunity to review RCW 46.61.506(3). The motion to dismiss focused on government mismanagement and dismissal of the prosecution not exclusion of any evidence.

Victim Penalty Assessment

*Issue 5: Whether this court should direct the trial court to strike the $500 victim penalty assessment imposed on Christopher Dodson at sentencing?*

*Answer 5: Yes.*

Christopher Dodson asks that, if we affirm his conviction, we direct the trial court to strike the $500 victim penalty assessment imposed on him. The State concedes to the removal of the assessment.

Prior to July 2023, former RCW 7.68.035(1)(a) (2018) required the sentencing court to impose the victim penalty assessment on any adult found guilty of a crime. In July 2023, the legislature amended RCW 7.68.035 to preclude imposing the penalty assessment "if the court finds that the defendant, at the time of sentencing, is indigent as defined in RCW 10.01.160(3)." LAWS OF 2023, ch. 449, § 1(4). An individual is indigent if he has "compelling circumstances that exist that demonstrate an inability to pay." RCW 10.01.160(3)(d).

Statutory amendments related to legal financial obligations generally apply to cases on direct appeal not final. *State v. Wemhoff*, 24 Wn. App. 2d 198, 201-02, 519 P.3d 297 (2022). A financial obligation becomes final at the termination of all appeals. *State v. Wemhoff*, 24 Wn. App. 2d 198, 201-02 (2022).

In fairness to the trial court, the court imposed the $500 victim penalty assessment on May 11, 2023, before passage of the new statute. The trial court indicated on the judgment and sentence that Dodson was indigent. Therefore, we remand to strike the assessment.

CONCLUSION

We affirm the conviction of Christopher Dodson for vehicular homicide. We remand to the superior court to strike the victim penalty assessment.

_____
Fearing, J.P.T.

WE CONCUR:

_____        _____
Lawrence-Berrey, C.J.                              Murphy, J.